## HASKELL v. PATTERSON.

### Opinion delivered June 23, 1924.

1. TRUSTS—CONSTRUCTIVE TRUST IN OIL AND GAS LEASES.—In an action to have a conveyance of oil and gas leases set aside and the grantor declared a trustee for a syndicate, evidence *held* sufficient to show that the properties were acquired by defendant as trustee for the syndicate, and that it would be a fraud on members of the syndicate to allow defendant to hold the properties in his individual right.

2. TRUSTS—CONSTRUCTIVE TRUSTS.—Constructive trusts arise when the legal title to property is obtained by a person in violation of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership.

3. TRUSTS—AGREEMENT TO PURCHASE OIL AND GAS LEASES CONSTRUED.—A trust agreement under which a syndicate to acquire oil and gas leases operated *held* clearly to show that the trustees were not prohibited from investing their own funds in the acquisition of such properties, but that, if they acquire any properties in their individual right, that fact must be designated in a manner so as to show that they are not syndicate properties.

4. TRUSTS—DUTY OF TRUSTEE TOWARD SYNDICATE.—Where a trustee of a syndicate organized to purchase oil and gas leases assumed the task of raising money to purchase leases, he could not change his attitude by claiming that he purchased property for his individual account without notifying the syndicate.

5. MINES AND MINERALS—SYNDICATE HELD A PARTNERSHIP.—Where members of a syndicate organized to purchase oil and gas leases had the power to amend the declaration of trust, to remove the trustees without cause and substitute new ones, to continue or terminate the trust, to require statement of accounts from trustees, and to transact any business specified in the call for the meeting, the syndicate was a partnership, rather than a trust.

6. MINES AND MINERALS—ESTOPPEL TO ENFORCE TRUST.—Where a trustee of a syndicate who had charge of its operations in acquiring oil and gas leases advanced money for such purposes, taking title in his own name, *held* the syndicate, not having been notified that he was claiming to hold such leases in his individual right, was not estopped to claim that he acquired them for the syndicate.

Appeal from Columbia Chancery Court, First Division; *J. Y. Stevens,* Chancellor; affirmed.

*Harnwell & Young, Gibson & Hull, Henry Stevens,* and *McKay & Smith,* for appellants.

Appellees seek to establish an implied trust, or resulting trust, under the second type, or general classification defined by Mr. Pomeroy, 3 Pomeroy, Equity Jurisprudence, § 1031, and as defined by this court in *United States Fid. & Guar. Co.* v. *Smith,* 103 Ark. 149; but in this we think they have wholly failed. They have failed to prove that any part of the trust funds placed in Haskell's hands for investment in property of this character were invested in the properties in litigation, and the chancery court so found. For the rule applicable to resulting trusts of the type in question, see 3 Pomeroy, Eq. Jur., § 1037. The determination of the question whether a resulting trust arises depends entirely upon the intention of the parties. 101 Ark. 451. Before a resulting trust could arise in this case, Haskell must have obtained the title to this property in violation of some duty, express or implied, that he owed the syndicate; in other words, must have been guilty of fraud, either actual or constructive, before he would be regarded as holding the legal title to the property for the benefit of the syndicate. 3 Pomeroy, Eq. Jur. § 1044. It appears that the chancellor decreed title to appellees in the Wepfer and Columbia Oil & Gas Company acreage on the theory that Haskell was an agent of the syndicate to purchase acreage, and that this alone prevented him from acquiring acreage in his individual capacity. When the reason for the rule, as stated by Judge Sanborn in *Trice* v. *Comstock,* 121 Fed. 620, ceases, the rule is impotent, and in any case the rule that an agent cannot purchase for himself is limited to the scope of his agency. Here the agency of the trustees was limited to the expenditure of funds delivered in securing a geological survey and purchasing oil and gas leases, and was not an unlimited agency to purchase. 2 C. J. 705, 59 N. Y. Sup. Ct. 410. No funds of the syndicate were used in the purchase of this property. If any right ever existed in appellees to impress this property with a trust, they were called upon to assert that right upon receipt

of notice of the purchase thereof by Haskell for himself, and they will not be permitted to stand by in silence, until the property has largely enhanced in value by the expenditures of Haskell on his own account. They must have proceeded at least in a reasonable time to assert their adverse claim. 33 Colo. 500; 153 Ark. 432; 10 R. C. L. 964; 125 Ark. 146; 147 Ark. 555; 10 R. C. L. 769; 9 Am. Dec. 500; 91 U. S. 587; 81 N. E. 614; 14 Ky. L. Rep. 606; 75 N. J. Eq. 90.

*Stone, Moon & Stewart, Noffsinger & Harris,* and *Joe Joiner,* for appellees.

1. The development syndicate agreement created an association which has some of the elements of trust, but more of the elements of a partnership. It is not necessary to determine the precise nature of the association for which Haskell acted, since the same rules must be applied, whether he was a trustee or a partner and managing agent. If it is desirable to determine the precise nature of the association, see Sears' Trust Estates as Business Companies, pp. 91-92 and 142-152; Wrightington on Unincorporated Associations and Business Trusts, pp. 38, 45, 71, 208, 211. Here the rights of third parties not being involved, it is not necessary to determine whether the association is a partnership or a trust. 233 Mass. 321, 123 N. E. 665; 241 S. W. 122, 125; Wrightington, Unincorporated Associations, etc., 109, § 21. The same principles apply, whether partners or not. 57 Mo. 531, 545; 1 Story, Equity Jur., § 468.

2. While acting as trustee for the syndicate, Haskell could not carry on for himself any business of the same nature or in competition with that of the association, and this rule must prevail even if the court finds that the trustee used his own funds in the transaction in question. The chancellor therefore properly held that all the oil and gas leases acquired by the trustee in Southern Arkansas belonged to the syndicate. 20 R. C. L. 879, 881; 21 R. C. L. 825; Amer. Ann. Cases, 1914D, 435; 4 How. 503, 11 Law. ed., 1076, 1099; 57 Mo. 531; 150 U. S. 524, 37 Law. ed., 1175; 92 Atl. 1033; 1 Wallace, 518, 17 Law. ed.

646; 5 Mackay (D. C.) 304; Ann. Cases, 1914D, 434; 201 S. W. 493; 101 Fed. 334; 1 Bates, Partnership, § 303; 43 Am. Rep. 242; 78 Pac. 550; 21 N. E. 193; 13 Ark. 173; 95 Ark. 408; 88 Ark. 373; 63 Ark. 516; 125 Ark. 146, 188 S. W. 571.

3. A trustee or managing agent cannot unite his personal and representative characters in the same transaction, and this Haskell attempted to do in the acquisition of the Wepfel and Columbia Oil & Gas leases. 78 Pac. 550; 66 Fed. 104; 8 Mo. App. 408.

4. As trustee or agent of the syndicate, Haskell was bound to keep his own property and business separate from the property and affairs of the syndicate, and if, in fact, any of his own funds were used in the acquisition of the properties in controversy, such funds were so mixed in the affairs and with the property of the syndicate as to make the whole the property of the syndicate. No change in the form of trust property can divest it of the trust. Dunn, Business Trusts, § 47, p. 80; 57 Mo. 531, 546.

5. For the following additional reasons Haskell could not, while trustee or managing agent, acquire, individually, any interest in the property in controversy: (1) He did not notify the beneficiaries or certificate holders of his desire or intention to acquire such separate interest; (2) he did not inform them fully or fairly of all the material facts and circumstances; and (3) he wholly failed to secure the consent or acquiescence of the beneficiaries. 48 N. E. 128, and authorities cited below on the question of estoppel or laches.

6. The three trustees, Haskell, Evans and Miller, constituted, as it were, one collective trustee, and, as such, were under the obligation to perform their duties, even in purchases and sales, in their joint capacity. This in itself affords additional and conclusive inhibition against Haskell's effort to "allot" to the syndicate only a small interest in the valuable properties in controversy, while taking for himself and associates a large interest. Dunn's Business Trusts, 172, § 97; Sears' Trust Estates,

etc., 248, § 248; Wrightington on Unincorporated Associations, etc., 247, § 46; 90 N. E. 278; 51 S. E. 439; 120 N. E. 487; 1 Perry on Trusts, 6th ed., § 411; 9 Fletcher, Cyclopedia Corporations, 10498, § 6093.

7. Appellants cannot successfully invoke the doctrine of estoppel and laches. The beneficiaries did not acquiesce in Hackell's breach of trust, and before estoppel could be invoked proof must have been made that all *cestuis que trust,* after being informed in the premises, fully acquiesced and concurred. 48 N. E. 128, 132; 126 Ark. 72, 189 S. W. 850; 87 Atl. 230, 234; 110 Fed. 322, 329; 10 Am. Law Rep. Ann. 378, 379; 10 R. C. L. 695, 697, 762; 153 Ark. 432, 243 S. W. 811.

Wood, J. The plaintiffs below, appellees here, as trustees of the Arkansas Development Syndicate (hereafter called syndicate), instituted this action in the chancery court of Columbia County, Arkansas, against the defendants below, appellants here, to have an alleged fraudulent conveyance set aside and a trust declared in an undivided interest in oil and gas leases of land in Columbia and Nevada counties, Arkansas, which leases were taken in the name of M. G. Haskell, and the lands are described in the complaint.

The plaintiffs alleged that M. G. Haskell and O. M. Evans were first named as trustees of the syndicate in a trust instrument dated May 31, 1921, and of August 8, 1921, which is attached as an exhibit to the complaint. The syndicate first had a capital of $7,500, divided into units or shares of the par value of $100 each, but which was afterwards increased on the 8th of August, 1921, to $50,000, and Franklin Miller was also named as one of the trustees. It is alleged that the moneys obtained by the sale of the certificates of interest were used by the trustees for the purpose of buying oil and gas mining leases and oil and gas mining properties in the State of Arkansas, and for developing the same for the benefit of the members of the trust; that Haskell procured the leases in his own name, and, in violation of the terms of

the trust instrument, with the funds of the syndicate, and was claiming the property as his own and fraudulently using and disposing of the same. The plaintiffs further alleged that the defendants, as trustees, failed to keep accounts and to make reports and to perform their duties required of them under the trust instrument; that Haskell fraudulently assigned and conveyed property belonging to the syndicate to Fred L. McDaniels, trustee, to hold for the use and benefit of Lucy Haskell, wife of M. G. Haskell. They prayed that a receiver be appointed to take charge of the trust and manage the properties for the benefit of the syndicate, and that the defendants be enjoined from disposing of the properties; that the defendants, Haskell, Evans, and Miller, be required to give a full and complete account of all their doings, and that the title to the properties be confirmed and quieted in the plaintiffs as trustees for the syndicate.

The defendants answered and admitted the execution of the trust instrument, and that Haskell was named as one of the trustees. They also admitted that Haskell obtained the properties described in the complaint in his own name, but denied that he purchased the same for the syndicate or with funds of the syndicate. They denied that, in purchasing the property, he was working for the syndicate, but averred that the property was purchased for himself with his own funds. They alleged that the members of the syndicate knew that Haskell was procuring the property in controversy for himself and not for the syndicate, and permitted Haskell to expend large sums of money and to labor more than a year and to incur large liabilities on his own account after they knew that he had obtained the property with his own funds and for his own use and benefit, and that the syndicate was therefore estopped from now claiming the property.

The plaintiffs filed a reply to the answer, and denied all of its allegations.

The testimony is exceedingly voluminous, and we shall not undertake to set it forth in detail, but only such

portions thereof as we deem material to the decision of
the cause.   The trust agreement of August 8, 1921, which
was substituted for the original agreement of May 31,
1921, is an exceedingly lengthy instrument, and it is
unnecessary to set forth its provisions *in haec verba.*
It is divided into sections, and the substance thereof is as
follows:

Section 1 names the syndicate as "The Arkansas
Development Syndicate," and declares that it is entered
into between the trustees and the subscribers for the pur-
pose of financing and securing a geological survey of
territory in southern Arkansas and northern Louisiana,
for acquiring oil and gas leases therein, and selling,
trading, and handling the same in such manner as, in the
judgment of the trustees, is for the best interests of the
syndicate.

Section 2 authorizes the trustees to receive subscrip-
tions to the capital stock to the amount of $50,000, and
to issue certificates of interest of the par value of $100
each to those who subscribed and paid for such interest.
The trustees shall issue to themselves a "number of
interests equal to one-fifth of the total number, or one
hundred interests, in compensation of their services; to
William R. Jewell and P. J. Costello, in compensation
for services rendered the syndicate, under contract with
the trustees, in such proportion as may be agreed upon,
one hundred interests of $100 each, apart from actual
living expenses and other expenses incurred in work for
and on behalf of the syndicate.   The trustees shall issue
to holders of original certificates a total of one hundred
and fifty interests of $100 each, divided among the orig-
inal holders in proportion to the number held by each
individual subscriber, in the ratio of three interests for
one interest previously held.   Under this allotment there
remained one hundred and fifty interests of $100 each to
be sold by the trustees at par, in such number as they
deemed advisable.

Section 3 vested title to the property in the trustees, to be held by them free from the management or control of the subscribers.

Section 4 provided for a meeting of the subscribers to be called on the first Monday of January, 1922, to determine the future policy and disposition of the syndicate and property; and by majority vote to wind up the syndicate, or to continue it.

Section 5 is as follows: "The funds of said syndicate received by the said trustees shall be by them employed in the securing of such additional acreage as may be necessary, in the expenses incident to the handling the affairs of said syndicate and disposing of such acreage as it may desire to sell, and for the purpose of exploiting or producing oil, gas or other minerals or royalties, or any interest in said oil, gas or minerals, or in any land which is believed to have the same. It being understood that the trustees are fully empowered to buy, sell and trade for the benefit of the said syndicate, and with the same power and authority and discretion as they could or would exercise if so selling or trading for themselves."

Section 6 is as follows: "The said trustees, in bargaining, selling, conveying, assigning, trading or exchanging any property so acquired by them, have full authority to execute such deeds, conveyances, or other instruments as to them may seem best, with such covenants, stipulations, conditions and warranties binding the said syndicate and its property as they may see fit in their discretion to enter into, and all the acts of the said trustees in the premises are hereby ratified and confirmed."

Section 7 relieves the trustees and the subscribers from any individual liability in contract or tort for acts growing out of any contract entered into by the trustees, but instead makes the property of the syndicate liable therefor.

Section 8 limits the individual liability of the holders of interests in the syndicate to the amount subscribed,

and limits the liability under any contract entered into by the trustees to the assets and property of the syndicate.

Section 9 authorizes the trustees to borrow money to carry on the business of the syndicate, and to secure the same by the assets of the syndicate.

Section 10 provides that the trustees shall only be liable for gross negligence, fraud, or breach of trust.

Section 11 authorizes the holders of a majority in value and amount of the syndicate interests to remove the trustees, at a meeting called for that purpose, by an instrument, duly signed and acknowledged, and to appoint their successors by such instrument, the successors to have the same powers, duties and estate as their predecessors.

Section 12 provides for a schedule to be duly executed and acknowledged by the trustees, in which the property, real or personal, acquired by the trustees shall be entered in ink, giving the names of the grantors, the date, location and brief description, with the book and page of the record where the instrument is recorded; that the trustees shall keep separate accounts with the syndicate by books or cards, showing clearly their dealings with the syndicate; that they "shall safely keep all deeds, conveyances and assignments, or other instruments running to them for the benefit of said syndicate, in a separate receptacle, which shall be plainly marked and designated so as to show that the said instruments are the property of this syndicate, designating the same by some word or number, as, for instance, 'M. G. Haskell, Franklin Miller and O. M. Evans Syndicate No. 1.'" That they shall so designate "in red ink the said documents or property of the said trustees individually, so as at all times to clearly show what properties are owned or held by the said syndicate, or in what properties it has made investments."

Section 13 provides that the trustees may invest the funds of the syndicate in other syndicates, corporations or companies carrying on a like business, the stocks or certificates to be thus acquired to be kept in a receptacle,

with indorsements in red ink indicating that they are held for the syndicate, the object of these provisions being to keep separate and distinct the property of the syndicate from any individual property or documents of the trustees.

Section 14 provides that the trustees shall issue certificates of interest of the par value of $100 each to the shareholders, which may be assigned by them. The assignments take effect when the assignee brings the same to the trustees and has the original certificate canceled and a new one issued in its stead. Until the assignment is thus protected, the trustees shall deal with the holders, as shown by their records, as the true owners.

Section 15 provides that, in the event of the death, resignation, or removal from the State of Oklahoma of the original trustees, the holders of a majority in value and amount of the interests shall appoint successors with the same powers, duties and estate as their predecessors.

Section 16 provides for a distribution of the assets of the syndicate, if the same is terminated as provided in § 4 of the instrument, to the holders of interest in *pro rata* amount of said assets, in proportion as the number of interests held by each interest-holder is to the amount of the assets which remain after all of the debts of the syndicate are liquidated.

Section 17 provides for special meetings of the holders of interests, at the call of the trustees, at any time, and that the trustees shall call such meetings upon the written request of a third in value and amount of the interest-holders, written notice of such meetings, giving the time, place and business to be transacted, to be given each holder of interest, through the mails, ten days before the time of the meeting, at which meeting the holders of interests may require of the trustees a statement of their accounts and dealings with the syndicate.

Section 18 provides that M. G. Haskell, Franklin Miller and O. M. Evans, as trustees, accept the terms of the instrument, and declare that they shall hold and dispose of any property or interests in property acquired

by them under the terms of the instrument, as trustees for the benefit of the holders of interest, and their heirs or assigns; that the trustees, or their successors, may become holders of interests in the syndicate evidenced by certificates like those issued by them to other holders of interests. This section concludes with a provision that the trustees and the subscribers thereto expressly agree to the terms of the instrument, and any person who thereafter may acquire an interest from the original subscribers, or otherwise, shall be deemed to have assented to and be bound by the instrument.

After the syndicate was established under the original instrument of May 31, 1921, the trustees named therein, Haskell and Evans, entered upon the performance of their duties. Haskell went to Arkansas about the first of June, 1921, and, with the assistance of Miller, who was not then a trustee, began to acquire property for the syndicate in Southern Arkansas and Northern Louisiana. They began to make investments and conduct operations which made it apparent that they would need much more than the $5,000 cash realized under the trust agreement of May 31, 1921. Hence the second agreement of August 8, 1921, above set forth, was entered into, which is the same as that of the 31st of May, 1921, except § 2 thereof, which increased the capital stock of the syndicate to $50,000 and makes a new allotment to the trustees for compensation and to the original holders of interest, leaving one hundred and fifty interests, or $15,000, in the syndicate treasury, to be sold by the trustees at not less than par.

According to the testimony of Haskell, the actual money of the syndicate which came into his hands was $13,975. The trustees and subscribers to the syndicate were all residents of Muskogee, Oklahoma. Miller and Haskell were experienced oil and gas men, and they conducted the negotiations for the syndicate in acquiring and developing the properties. The other trustee, Evans, was in the brokerage business at Muskogee. He remained there and assisted Haskell two or three days in raising

money by selling interests in the syndicate. He was supposed to be the secretary of the trustees. Haskell was the prime mover in the organization of the syndicate and the controlling genius in its management by the trustees. The trustees employed geologists to examine and report upon the territory in Arkansas and Louisiana in which the investments were contemplated. Upon receiving the reports of the geologists, the leases were taken in the name of Haskell, Miller, or Costello, with no indication on the face of the leases that they were being taken for the syndicate.

The acreage taken in the name of Haskell, as alleged and described in the complaint and admitted in the answer, is quite extensive. The method pursued was to take considerable territory in the localities reported and deemed favorable for the discovery of oil and gas. After acquiring the property, the trustees would sell part of the acreage in certain localities or blocks to oil operators or drillers, the only consideration being that they should drill the lands so conveyed for oil. The trustees were able usually to conduct such operations without any expenditure of syndicate money. The acquisition and development of the properties of the syndicate by the trustees were conducted in this manner from about the first of June, 1921, until they were deposed early in 1923. On December 29, 1921, Haskell wrote a letter to the holders of interest in the syndicate, in which he refers to the meeting to be held by the holders of interest on the 3rd of January, 1922, to determine the question of the continuance of the work of the syndicate under the present trustees, or the closing of its affairs on that date. In this letter he recounts the amount of money which had been received by the trustees, as above mentioned, to the sum of $13,975, and he shows that the "expenditures of the trustees in behalf of the syndicate total $16,152.27, as per list," viz:

| | |
|---|---:|
| W. R. Jewell, living and traveling exp............$ | 2,331.50 |
| P. J. Costello, living and traveling exp.......... | 2,176.00 |
| Franklin Miller, living and traveling exp.... | 1,360.00 |
| Purchase stock in Mary Oil Co............................ | 2,500.00 |
| Purchase Dodge car.............................................. | 1,251.00 |
| Purchase Magnolia royalties.............................. | 700.00 |
| Purchase royalties 29-17-14................................. | 360.00 |
| Optional price leases and royalties................ | 640.00 |
| 1/6 interest 20 acres leases and royalties...... | 166.67 |
| Incidental expenses.............................................. | 1,290.47 |
| Expenses Woodward-Dobie-Bernie in part... | 250.87 |
| Expenses Ashley Co. in part drilling.............. | 603.00 |
| M. G. Haskell, expenses paid.............................. | 2,422.76 |
| Total ......................................................................... | $16,052.27 |

The letter continues as follows:

"Making an expenditure of $2,127.27 over receipts, for which the trustees have arranged a loan of $2,000 at eight per cent. (with personal indorsement of M. G. Haskell), and the balance of $127.27 is due M. G. Haskell on open account. All of the obligations of the syndicate have been met, with the exception of attorneys' fee for title work, not as yet rendered. In explanation of the above disbursements, beg to set out that, outside of actual living expenses, the account of Messrs. Costello, Jewell, Miller and the writer contain many items of expense incurred in behalf of the syndicate, and various other items equally necessary. Mr. Costello's car has been used by the syndicate during the entire time, making the cost of upkeep of this car, as well as the car owned by the syndicate, a very substantial amount.

"While the well drilled in 22-17-14 by the Mary Oil Company was abandoned, this company holds title to various leases, including a tract on the Magnolia structure and a tract on the Kerlin structure. Inasmuch as the syndicate holds a one-sixth interest in this company, the $2,500 invested may prove profitable. On the amount expended for options, $140 of this amount represents options that have expired; the remaining $500 was paid

for options on leases in township 15, range 20, Columbia County, on deal which the writer expects to see consummated on the 4th of January. On completion of deal the syndicate would be entitled to a return of the $500 and receive a substantial interest in some acreage holdings to be drilled, and which look very promising to the writer. The item of $1,290.47 of incidental expenses covers amounts paid for maps, stenographic work, a portion of hotel bills, labor bills, and of telephone and telegraph bills, etc. (The item of telegraph and telephone bills constitutes a considerable item every month, and is absolutely necessary in order for the trustees to keep in touch with all work being done). No salaries of any nature have been paid, and the writer feels that all working in behalf of the syndicate have been keeping their expenses as low as possible.''

Haskell then mentions the ''present holdings of the syndicate,'' and tells what is being done with them, and states in detail the present development and prospects. Among other things he says: ''An agreement for the purchase of certain acreage in sections 23, 24, 25, 26, township 15, range 20, has been made, with a deposit made, and deal is expected to be closed within the next week. The deal calls for a well in section 24, and the syndicate would acquire an interest in well and couple hundred acres of close-in acreage. Location for this well was made by W. L. Dobie, geologist. In section 11, same township and range, a well was drilled to 2,175 feet, and has been flowing a small amount of high-grade oil, although it has been impossible to operate the same successfully on account of failure to properly set the casing. The new test would be located on what Mr. Dobie considers the best part of the structure. All of the above holdings are in Columbia County, Arkansas.''

After telling of the wells being drilled in Union County, Arkansas, on holdings of the syndicate, and the prospect for a test well on 3,000 acres held by the syndicate in Union Parish, Louisiana, and the prospect of securing at least 5,000 acres in Ashley County, Arkansas,

with good prospects for a test well, and disposing of their excess holdings at a good price, and of tentative agreements for trades to acreage on other structures to be drilled by other parties, he says: "In conclusion, wish to say that those giving their time and efforts to the syndicate, without reference to the writer, have given intelligent and valuable service, and I feel certain that the returns from their investments will prove very profitable to those whose interest in the syndicate is from the standpoint of cash paid in. The prospects for the opening up of additional pools of oil in southern Arkansas and northern Louisiana are very bright, in our opinion, and the holdings we now have, together with what we should hereafter acquire, with our knowledge of the country and existing conditions, should prove of considerable value. The trustees ask for and expect your full cooperation and support. The writer, with the interest of your syndicate a paramount issue, feels that our services warrant your giving it. The trustees, Mr. Jewell and Mr. Costello, join in asking for the approval of a resolution continuing the present syndicate agreement."

A copy of the above letter was delivered to and received by the members of the syndicate.

While the plaintiffs seek to recover the large amount of acreage as set forth in their complaint, yet the most valuable acreage in controversy is that territory designated in the record as the Wepfer acreage and the Columbia Oil & Gas Company acreage (hereafter, for convenience, called, respectively, the "Wepfer" and "Columbia" acreages), because on this territory there are producing wells, and the other acreage in controversy is what is known as "wildcat" acreage, on which there has been no production.

In regard to the Wepfer acreage, the testimony of Miller, for the plaintiffs, tends to show that he and Haskell conducted the negotiations for this tract. They were commenced in December, 1921. There were about 1,400 acres in this deal. It was reported on by both the geologists employed by the syndicate. An option was taken

on the property for a consideration of $500, paid by check or draft drawn by Haskell on the syndicate. They raised the money to close the deal by selling acreage of the syndicate amounting to about $15,000. The money required to make up the purchase price of the Wepfer leases was put up by a check for $500 drawn by Haskell to Wepfer, December 22, 1921; January 21, 1922, $660 from Haskell to Wepfer from sale of acreage on the twenty-four deal; January 21, 1922, a check from McDaniel to Haskell, indorsed by Haskell to Wepfer, $2,666.40; January 27, Roxana Petroleum Company to John G. Wepfer, $2,800, from eighty acres sold January 21, 1922; Franklin Miller to Wepfer, $40.27, making a total of the price of the Wepfer acreage. Witness put up the $40.27 in way of a loan to the syndicate. He stated the amount was returned to him later by Haskell. The Columbia acreage was acquired when the drilling was down on the Wepfer acreage about sixteen or seventeen hundred feet. Haskell and witness then consulted together about taking over the 1,800 acres in the Columbia acreage. Witness then details the circumstances of that deal between its owners and witness and Haskell, which it is unnecessary to set forth. He stated that he and Haskell closed the deal for the Columbia acreage; that the deal did not cost anything except a little expense to get it. After the deals were closed for these properties, the drilling thereon developed producing wells. The syndicate was paying witness' expenses. They used the syndicate's automobile in consummating the deal for the Wepfer acreage, but not in the Columbia deal. Witness was not working for any one except the syndicate. The Wepfer and Columbia people did not know anything about the syndicate, but Haskell and witness knew that they were working for the syndicate. Witness stated that it was June, 1922, when he first heard Haskell suggest that he was going to cut the syndicate in on the Wepfer and Columbia acreages. He understood Haskell to consider it his property, and that he would give the syndicate an interest from a moral standpoint. About the time the well came

in, Haskell told witness that he lacked about $3,700 of paying for standardizing the well. He thought they ought to organize a stock company, and talked about the interest of witness and Woodward and other different interests—thought it best to organize a stock company because of the different interests, and so many of them could not put up the money to meet the indebtedness. Witness suggested that they give to each one a letter showing their interest, and let them hold the same in their own name, and that they borrow $500 on the property. Haskell made out a statement of his assets, and they borrowed the money, and witness supposed that Haskell paid off the note. Witness was not claiming any interest in the Wepfer and Columbia acreages for himself individually. He only claimed an interest in the syndicate. He told Haskell that if he did not get his interest in the syndicate he wanted the interest that Haskell proposed to set apart to him for his services. The syndicate furnished the money, and witness knew all the time that Haskell was trying to retain a certain interest for the last four or five months, and retain witness' interest along with his, but he wanted to give the syndicate a square deal, and did not think it was right to claim an individual interest after the suit was started. Witness had a one-third of $10,000 worth of stock in the syndicate. Haskell proposed to set aside one-sixth of the 500 acres of the Wepfer acreage and one-fifth of the 310 acres of the Columbia acreage to witness, which would mean more money to witness than he would get out of the syndicate if the syndicate won.

Haskell, in his testimony, gave a detailed account of his stewardship as trustee of the syndicate, and also of his individual transactions. He stated that in December, 1921, the syndicate not only had expended all the funds derived from the sale of interests, but were indebted to him as shown by his statement of December 29. The syndicate owed him, at the time he testified, for expenditures on behalf of the syndicate in excess of receipts from all sources, the sum of $7,159.57. Witness opened

negotiations for the Wepfer acreage on December 21, 1921, and procured an option on this acreage for $500 down, on December 21, 1921. Witness drew a draft for $500 in favor of Wepfer on the syndicate to pay for the option. It was not paid by the syndicate, and witness paid the same out of his own funds. The contract for the purchase of the Wepfer leases called for the payment of $6,666.67 for 720 acres and the drilling of a well 2,300 feet. The contract was dated December 21, 1921. Five hundred dollars was to be paid in cash, and the balance on January 4, 1922. The amount was not paid at that time, and witness paid, out of his own funds, $500 for extensions. He finally paid the full amount for the Wepfer acreage, and no funds of the syndicate were employed in making the entire deal. The syndicate never had any funds sufficient to meet their obligations to witness, after the date of obtaining the option for the Wepfer acreage. Witness purchased the Wepfer leases for himself. He paid for drilling the wells out of sale of the acreage and from his personal funds. Four wells had been drilled on the Wepfer acreage, and the fifth was going down. Witness began negotiations for the Columbia acreage about the 10th or 12th of April, 1922. Witness put up a check for $1,000 as earnest money, which was afterwards returned to him. This was not syndicate money. Witness had assigned different contracts for the drilling of wells on the Columbia acreage, giving the drillers one-half interest, with the exception of 120 acres which he had sold for $17,500. The syndicate had no interest in this property. In the fall of 1921, before the Wepfer or Columbia acreages had been tested, witness offered to turn over a two-fifteenths interest in certain property to the syndicate, because he felt that, as "it had put its money down there and had not obtained results to indicate a return on the money," he should carry a sufficient interest for the syndicate, so that, if he made anything personally, he would give the syndicate enough interest in the Wepfer deal to make it some money. He communicated this offer in the letter of

December 29, 1921, which has been set forth above. This offer was made before he acquired the Columbia acreage, and after that he made a selection of 500 acres, including 160 acres in the Wepfer acreage and 340 acres in the Columbia acreage, and gave the syndicate a 2/15 interest therein. He didn't indicate in his letter just what the interest would be. Witness was not able to raise any funds for the syndicate from the sale of interests, and none of the other members of the syndicate advanced or procured any additional funds after the first of December, 1921. Witness exhibited correspondence which he had with John R. Dudding and other holders of interests, which he claims fully advised the holders of interests in the syndicate of the interest he had acquired in the Wepfer and Columbia acreages, and he protests that the members of the syndicate were fully advised by his letters and reports of all his dealings, either as an individual or as trustee of the syndicate, and that they acquiesced therein, and that the syndicate was thereby estopped from claiming any interest, except that which he had indicated he was willing to give it in the Wepfer and Columbia acreages. Witness denied that, at the time he acquired the Wepfer and Columbia acreages, he was working for the syndicate. He was unable to determine the date he started to working for himself, but it was after the syndicate funds had been exhausted, and it was necessary for him to do something. He could not give an itemized list of expenditures for the syndicate unless he could get certain information from Muskogee. The reason he did not notify Evans at Muskogee that he was about to make a personal deal for the Wepfer and Columbia acreages was that he had been trying to raise more money from the syndicate, and Evans and Dudding had advised him that money was tight, and they could not get it. He received from sales out of Wepfer and Columbia acreages the gross sum of $42,999.20.

O. M. Evans, trustee, testified that he didn't know that Haskell was taking leases to develop for himself

individually until February, 1923. He and Haskell had talked over the affairs of the syndicate during the Christmas holidays of 1921, and he was authorized to vote Haskell's interest in the syndicate at the meeting to be held in January, 1922, when the syndicate was continued for another year by the interest-holders. Haskell was in charge of the finances of the syndicate. Witness was supposed to be the secretary of the trustees, but kept no books showing a list of the members and the dealings of the trustees. Haskell never furnished any memorandum from which he could make up such a book. Witness understood that the syndicate agreement required the trustees to devote their entire time to the affairs of the syndicate, in consideration of the interest set apart to the trustees. Witness did not do it, and voted for the resolution discharging himself.

. The testimony of the plaintiffs tended to prove that they did not know that Haskell was doing any business in the oil and gas development other than for the syndicate. They understood that he was giving his entire time to the syndicate. The testimony of these and other witnesses tended to prove that Haskell, when he was organizing the syndicate, promised that, for the interest set apart to him in the syndicate, he would devote his entire time for the syndicate until it was a paying proposition; that Haskell never advised them that he was going to have an individual or personal oil business. As soon as the plaintiffs ascertained that Haskell was claiming valuable interests adverse to the syndicate, steps were taken to remove the trustees and to substitute others, which was done on the 5th of March, 1923, and the plaintiffs were substituted in their stead, and they immediately instituted this action.

Although there is much other testimony in the record, oral and documentary, the above, it is believed, presents the salient features of the evidence upon which the trial court based its findings of fact, to-wit: that M. G. Haskell, while in the employ of the syndicate, did purchase oil and gas leases for his own personal account and

pay for same out of his own personal funds, which leases were executed and assigned to Haskell personally; and upon which findings the trial court concluded that Haskell, while acting as a trustee, could not legally engage in purchasing oil and gas leases for his own personal account within the territory for which he was trustee for said syndicate; that he holds the leases in trust for the use and benefit of the syndicate, and that the assignment of Haskell to McDaniels, as trustee for the benefit of his wife, Lucy S. Haskell, is without consideration and void. Upon these findings of fact and law the court entered a decree setting aside the conveyance to McDaniels, and quieting the title to the plaintiffs in the lands which are described therein. From that decree is this appeal.

1. Mr. Pomeroy announces the doctrine on constructive trusts, which must govern the facts of this record, as follows: ''Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and, in most cases, contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust. They arise when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership. As the trusts of this class are imposed by equity, contrary to the trustee's intention and will, upon property in his hands, they are often termed trusts in *invitum;* and this phrase furnished a criterion, generally accurate and sufficient, for determining what trusts are truly 'constructive.' An exhaustive analysis would show, I think, that all instances of constructive trusts, properly so-called, may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source. Even in that single

class where equity proceeds upon the maxim that an intention to fulfill an obligation should be imputed, and assumes that the purchaser intended to act in pursuance of his fiduciary duty, the notion of fraud is not invoked, simply because it is not absolutely necessary under the circumstances; the existence of the trust in all cases of this class might be referred to constructive fraud. This notion of fraud enters into the conception in all its possible degrees. Certain species of the constructive trusts arise from actual fraud; many others spring from the violation of some positive fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real, the necessary element of that unconscientious conduct which equity calls constructive fraud. Courts of equity, by thus extending the fundamental principle of trusts—that is, the principle of a division between the legal estate in one and the equitable estate in another—to all cases of actual or constructive fraud and breaches of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property; they can follow the real owner's specific property, and preserve his real ownership, although he has lost, or even never had the legal title, and can thus give remedies far more complete than the compensatory damages obtainable in courts of law. The principle is one of universal application; it extends alike to real and to personal property, to things in action, and funds of money.'' 3 Pomeroy's Equity Jur., §§ 1044, 1053 and 155. We quoted the latter section from Mr. Pomeroy in *Bray* v. *Timms,* 162 Ark. 247.

Since this case, in its final analysis, must be determined largely upon our conclusion of fact, we have set forth above the material facts, and they speak for themselves. We deem it unnecessary to argue them at length. After a careful consideration of the entire record, we are convinced that the properties acquired by Haskell, title to which was taken in his own name, were the properties of the syndicate, under the doctrine of constructive trusts as above announced. We do not interpret the

trust agreement as prohibiting the trustees named therein from acquiring oil and gas properties in their own right. On the contrary, there is language in §§ 12 and 13 which clearly indicates, by implication at least, that the trustees are not prohibited from investing their own funds in the acquisition of such properties. But it is equally clear from these provisions that, during the time the trustees are acquiring and managing such properties for the syndicate, if they acquire any properties in their individual right that fact must be designated in a manner so as to show that they are not syndicate properties. This was not done. No separate books or cards were kept showing separate accounts of the trustees, as individuals, distinguishing their operations as such from operations as trustees of the syndicate. No separate receptacle was kept for documents and conveyances, with indorsements *in red ink* thereon, showing that they were for the individual rather than for the syndicate. The trustees wholly ignored these provisions of the trust instrument, but, on the contrary, elected from the start to keep all leases acquired, whether in the name of Haskell, Miller, or Costello, as the property of the syndicate, and there was no indication to the contrary until long after all the properties, including the Wepfer and Columbia acreages, had been acquired.

Haskell testified that he conceived the idea of making the Wepfer deal for himself about the first of December, 1921; that he made an effort to raise money for the syndicate; that all the syndicate funds had long been expended, and that he was unable to raise any money from the syndicate himself, or to get any assistance from syndicate members in raising more money, and that the Wepfer deal contemplated an expenditure in excess of all the amount that could have been raised by the syndicate if they had not spent a cent or any of the money. Haskell contends that his testimony in this respect was corroborated by correspondence with Dudding by letter of October 28, 1921, in which Dudding stated that they had worked "awful hard to raise more money, but in

vain.'' But this statement of Dudding as to the inability to raise money for the syndicate was before Haskell's letter of December 29, 1921, in which he makes a report to the syndicate of the transactions conducted by the trustees up to that time. In this letter, while he refers to an expenditure above explained of $2,127.27, he states that the trustees had arranged a loan of $2,000 for the payment of same by Haskell's indorsement, and the balance of $127.27 he had advanced as his own money. There is in all this letter no urgent appeal to the members of the syndicate to raise funds to enable the trustees to continue their extensive operations. On the contrary, the whole letter, as we construe it, was optimistic in tone, and gave the members of the syndicate to understand that the syndicate, instead of being in a distressed condition financially on account of the operations of the trustees, was then in a prosperous condition, and could be safely continued in anticipation of great profits, and he asked that it be continued.

Now, without arguing all of the testimony in the record which convinces us that Haskell should be held to have acquired the properties in controversy, especially the Wepfer and Columbia acreages, for the syndicate, it suffices to say that his own letter of December 29 shows that, up to that time, he himself regarded the option he had taken on the Wepfer acreage for the benefit of the syndicate. In this letter he plainly states that the amount expended ''for optional price leases and royalties was $640'' for the syndicate, and the undisputed testimony shows that $500 of this was for the option on the Wepfer acreage. True, in explaining this disbursement he says that the syndicate, on completion of the deal, would be entitled to a return of $500 and receive a substantial interest in acreage holdings to be drilled which looked very promising.

In construing the trust agreement by its own language, and in the light of the interpretation that was put upon it by Haskell and the other trustees, as well as the other members of the syndicate, it is certain that

it was not the intention of any of the parties to create a twilight zone of uncertainty in the management of the affairs of the syndicate, in which it might be difficult to discern just when Haskell was representing the syndicate and when he was representing himself. The instrument, as a whole, shows clearly that it was the intention of all parties that the trustees should give their first thought to the interests of the syndicate. The trustees were to devote their time and services to the syndicate, in consideration of the funds placed in their hands for investment and management and the opportunities thus afforded them to make money both for themselves and the syndicate. To sum up the whole matter on the question of fact, we are thoroughly convinced that, if Haskell, when the prospects for oil and gas on the Wepfer and Columbia acreages seemed imminent, had served the syndicate with the same fidelity and zeal that he served himself, he would have experienced no difficulty whatever in financing the same proposition for the syndicate as he financed for himself. Haskell, from the beginning of the operations under the trust agreement, had assumed the task and duty of raising money and handling vast operations for the syndicate, and his customary procedure was to use all the instrumentalities of the syndicate, its full equipment, in the negotiations which were consummated in the taking over of these properties. He could not change his attitude without giving notice to the members of the syndicate of such change. He contends that his letter of December 29 and subsequent letters did this. But not so. These letters ''back home'' contained no definite, explicit statement that would advise the members of the syndicate of his decision to abandon the syndicate's interests and to represent himself. The letters in which he claims he gave such notice were couched in language which would only camouflage his real purpose, and give no notice whatever of the actual situation. While, under the trust instrument, there was nothing to inhibit Haskell from acquiring leases individually, yet it must be held, under all the facts of this record, that he

did not do so.    The money he raised from handling the properties in controversy was money of the syndicate, and individual funds, if any, advanced by him was money loaned to the syndicate.    He had done this before, why not now?    Haskell's professed magnanimity in donating a two-fifteenths in a selected small portion of the "Wepfer" and "Columbia" as a moral duty to the syndicate, which, according to his testimony, already owed him more than seven thousand dollars, is, to say the least, not impressive.    To us this ostensible gift appears more like an emollient to a buffeting conscience than the satisfaction of a moral obligation.    In reaching this conclusion it is unnecessary to convict Haskell of actual fraud in acquiring the properties in controversy, and we do not do so.    But we do say that we regard the proof as clear, decisive and convincing that Haskell acquired the properties in controversy under circumstances which constitute a constructive trust, and it would be a fraud on the members of the syndicate to allow him to hold them in his individual right.    Under the doctrine announced by Mr. Pomeroy above, the law superimposes upon his transactions the trust relation, and he holds title to the leases in controversy in trust for the syndicate, and must account to the syndicate for his dealings in the premises.

2.    It is certain that this syndicate is not a pure common-law trust, as was created by the instrument in *Betts* v. *Hackathorne,* 159 Ark. 621-625.    The syndicate created by the instrument under review combines some of the features of a partnership with those of a pure trust, but the predominant features are those of a partnership rather than a pure trust, because the interest-holders have the power to amend the declaration of trust, to remove the trustees without cause and substitute new ones, to continue or to terminate the trust, to require of the trustees a statement of their accounts in dealing with the syndicate and its assets, and to transact any other business pertaining to the properties of the syndicate specified in the call for their meeting.    In other words, here the beneficiaries or interest-holders are the masters

of the trust, rather than the trustees. Where such is the case the association or syndicate should be classified as a partnership, rather than a pure trust. Sears, "Trust Estates as Business Companies," p. 144 *et seq.;* Wrightington's "Unincorporated Associations and Business Trusts," p. 38, *et seq.;* see also p. 71, where the author cites *Baker-McGrew Co.* v. *Union Seed & Fertilizer Co.,* 125 Ark. 146.

But, whether this syndicate should be classed as a pure trust or a partnership, under the terms of the instrument a fiduciary relation existed between the trustees and holders of interests, and this relation imposed upon the trustees primarily the duty, as we have seen, to look after the interests of the syndicate always in preference to their own. In defining the duties and obligations, and appraising the liabilities of trustees, the same rules and tests are applied to their conduct as are applicable to partners. *Pomeroy* v. *Benton,* 57 Mo. 545. As to the duties of a partner to those associated with him in the joint enterprises, see *Boqua* v. *Marshall,* 88 Ark. 373, and other numerous cases in appellees' brief.

Under the broad powers conferred upon the trustees by §§ 5, 6 and 9 of the trust instrument, we have no doubt that Haskell, in conducting the negotiations leading to the acquisition of the properties in controversy, should be held to have acted for the syndicate, rather than for himself. Having acquired the properties for the syndicate, Haskell was powerless to undo his work by undertaking to hold for himself the lion's share while allotting to the members of the syndicate and others such small portions as he wished them to possess. The trustees must be held to have acted as a unit in the acquisition of the properties, and Haskell had no power, as a trustee, to make allotments of the syndicate property to his own advantage and their hurt. Bum's Business Trusts, p. 172; Sears' Trust Estates, § 132; Wrightington's Associations and Business Trusts, p. 246, § 45.

3. It follows from what we have already said that the syndicate is not estopped from maintaining this action

by its present trustees. There was nothing in the letters of Haskell or in any of the testimony to apprise the holders of interest in the syndicate of the actual situation at the time Haskell acquired the properties in controversy. On the contrary, we believe that Haskell's letters were so framed that no interest-holder could have been accurately informed thereby of the true situation, and we do not find anything in the testimony that was sufficient to put them on inquiry of their rights until just before the commencement of this action. *White* v. *Sherman,* 48 N. E. 128; *Endicott* v. *Marvel,* 87 Atl. 230-234. The interest-holders, through their trustees, acted with due diligence, after they ascertained the facts, in instituting this action to cancel the conveyance from Haskell to McDaniels, trustee for Haskell's wife.

The decree is correct, and it is therefore affirmed.