JOHNSON v. BELLMONT.

Opinion delivered February 7, 1927.

1. MINES AND MINERALS—CONTRACT TO PURCHASE OIL LEASE.—A written contract for the purchase of an oil lease was not void as having been executed under a mutual mistake of fact because the sale of the property by a receiver to one of the parties, without their knowledge, had been set aside by order of court, where the other parties proceeded under the written contract by purchasing at a subsequent receiver's sale.

2. TRUSTS—WHEN ARISES.—Where, as a result of plaintiff's information relative to an oil lease, defendants were put in touch with such property, and a written agreement was entered into whereby plaintiff was to have a one-fifth interest, a lease acquired by defendants in their own name will be held subject to a trust in favor of plaintiff for such interest.

3. FRAUDS, STATUTE OF—ORAL AMENDMENT OF WRITTEN CONTRACT.— An oral agreement amending a written contract for an interest in an oil lease is not within the statute of frauds where it went to the manner of acquiring the lease and did not change the relative interests of the parties.

4. MINES AND MINERALS—FAILURE TO CONTRIBUTE TO DEVELOPMENT OF LEASE—LACHES.—Where plaintiff furnished information to the purchasers of an oil lease under a contract for an interest therein, his failure to contribute money to the development was not laches where the lease was at all times worth more than it cost, and money borrowed for development was obtained on the security of the lease, and suit was brought for plaintiff's interest as soon as he was informed that his interest had been forfeited.

Appeal from Ouachita Chancery Court, First Division; J. Y. Stevens, Chancellor; affirmed.

Gaughan & Sifford, E. E. Godwin and T. D. Crawford, for appellant.

Coulter & Coulter, Joiner & Stevens and W. R. McHaney, for appellee.

J. N. Saye, amicus curiae for appellee.

SMITH, J. Appellee, H. B. Bellmont, who is a geologist and petroleum engineer, made a survey and investigation of the southwest quarter of the southeast quarter section 34, township 15 south, range 15 west, Ouachita County, Arkansas, which convinced him that the land was promising territory for oil exploration. He made

inquiry about the land, and ascertained that it was involved in litigation and was in charge of a receiver, who had possession of the property under the directions of the court. The land was owned by J. M. Farris, who had give an oil lease to E. L. Miller as trustee, who had become involved in litigation, and there were debts and liens against the property amounting to about $20,000. Appellee entered into an agreement with Haines, the receiver, to pay the creditors and the court costs and thereby terminate the receivership, and, at the same time, entered into a contract with Miller whereby Miller was to convey or release to appellee his residuary interest in the property.

To carry out this arrangement it was necessary for appellee to interest some one able to command the necessary money, and, with this purpose in view, appellee went to Rock Island, Illinois, where he got in touch with appellants, with whom he had several conferences in regard to going into the adventure. Appellants had never been to this oil field, and knew nothing about the proposition except what they were told by appellee, and they asked time to investigate the proposition.

When this was done, it was decided not to attempt to acquire the lease by private sale, but to permit a sale by the receiver, which had been ordered by the court to be made, and the property was sold by the receiver on October 18, 1924. J. D. Anderson, as attorney for appellee, became the purchaser at this sale for $22,000, it being agreed between Anderson and the receiver that appellee should have a reasonable time to execute the bond required by the order of sale.

On October 27 appellee, accompanied by appellants, Johnson and Flannigan, arrived in El Dorado, and they immediately went out to inspect the property. The pros pects were sufficiently alluring to enlist the interest of Johnson and Flannigan, and they discussed with appellee what the respective interests of the parties should be if they went into the adventure. Johnson and Flannigan represented not only themselves but Quinlan and Hawley,

all of whom were to share equally in the adventure if they went into it at all.

On the day following the inspection of the property, Johnson and Flannigan went with appellee to the office of appellee's attorney. This attorney was among the numerous witnesses in the case, and he testified that he drew up a contract which outlined the agreement appellee had made with Johnson and Flannigan. This agreement reads as follows:

"MEMORANDUM AGREEMENT

"It is hereby mutually agreed by and between H. B. Bellmont, party of the first part, and D. N. Johnson, W. H. Flannigan, Wm. J. Quinlan and J. H. Hawley, parties of the second part hereto, that the party of the first part did, on the 18th day of October, 1924, purchase all the property making up the estate in the case of E. L. Miller et al. against Geo. Barbare et al., pending in the Ouachita Chancery Court, Second Division, and that the parties of the second part have advanced the sum of five thousand and no/100 ($5,000) dollars on the purchase money, and have undertaken to pay the balance, making a total of twenty-two thousand and no/100 ($22,000) dollars.

"That if, and when, the parties hereto shall have paid the entire purchase money of said property and the receiver thereof executed deed, the property will be conveyed by the party of the first part hereto to the parties of the second part, to the extent of the four-fifths, one-fifth to be conveyed to each of the parties of the second part hereto.

"It is further contemplated that the parties hereto are now organizing themselves, together with others, into a corporation to be known as Smackover Petroleum Corporation, and, in the event the said company shall have been fully incorporated at or before the date of the execution of the deed or assignment from the receiver to the parties hereto, the said property shall be conveyed to the corporation. And that the party of the first part shall receive in payment of his one-fifth interest in said property, the capital stock of said corporation to the

amount of twelve thousand and no/100 ($12,000) dollars, and that he, the said Bellmont, will make, execute and deliver unto the said parties of the second part, or to the corporation aforesaid, good and sufficient conveyance in and to said property.

"Witness our hands and seals on this the 28th day of October, 1924.

                    "H. B. Bellmont,
                        "Party of the first part.
                    "D. N. Johnson,
                    "W. H. Flannigan,
                    "Wm. J. Quinlan,
                    "J. H. Hawley,
                        "Parties of the second part."

At the time this contract was signed, none of the parties knew that the court had, on the 20th of October, set aside the receiver's sale. When that fact was discovered, an attorney was employed to sustain the sale and to secure the confirmation thereof, if this could be done. The court's order was not set aside, and there is some conflict in the testimony as to why this was not done. Appellants testified that the term of court had lapsed before the attorney was prepared to present their case to the court. Appellee testified that it was agreed to proceed under the written contract set out above and to buy the property at the second sale which had been ordered by the court.

After the conference between appellee and appellants at the attorney's office, the receiver executed to appellee a certificate of purchase, and an escrow agreement was entered into between appellee and the receiver, setting forth the terms and conditions of the sale. By this escrow agreement, appellee deposited to the receiver's credit with the Bank of Commerce of El Dorado the sum of $5,000, and a note for the balance was executed to the receiver's order, which was also placed in escrow. This note was signed at the time by appellee and Johnson and Flannigan, and it was agreed that Johnson and Flannigan should take a duplicate of the note to Illinois and have it executed by Quinlan and Hawley, and that the

note so signed should be signed by all parties and substituted for the one placed in escrow.

When it was discovered that the first sale by the receiver had been set aside, the parties agreed that they would proceed under their original agreement to acquire the lease, and that, when acquired, it should be owned by all five of the contracting parties, each owning a one-fifth interest. This is the big question of fact in the case, but the court found the fact to be as stated, and we think the testimony supports that finding. The proposition of appealing from the order of the court setting aside the sale was discussed, but it was agreed that the matter could be closed more expeditiously by permitting a second sale to be made and by buying at that sale. Appellee had filed a motion to vacate the order setting aside the first sale, but, by agreement, the hearing of this motion was continued to November 29, 1924, the day upon which the second sale was to be made.

A second sale was ordered and was later made by the receiver on November 29, 1924. Desiring to purchase the lease as cheaply as possible, it was agreed that the property should be bid in by Farris, and this was done, the purchase price being $23,000.

It was also agreed that appellee Bellmont should not attend the sale. He went to El Dorado to release the escrow agreement, in order that the $5,000 on deposit in escrow might be available to perfect the bid made by Farris. Johnson advanced $6,000 additional to indemnify the surety on the bond which the purchasers were required to execute pursuant to the order of sale, and, when this was done, Farris transferred his certificate of purchase to Johnson.

Up to this time the testimony is overwhelming that all parties interested regarded the second sale as having been made for the benefit of all of them; but it is the insistence of appellants that appellee passed out of the transaction by reason of his failure to "kick-in," as they expressed it, with his part of the money to pay for the lease and its development.

After the second sale, Johnson and his associates attempted to buy the interest of appellee, and offered him $3,000, which appellee declined. This discussion and offer took place in Rock Island, Illinois, on February 4, 1925. When this offer was declined, Johnson stated to appellee that he (appellee) had no interest in the lease, whereupon appellee returned to El Dorado, and, on February 9, 1925, instituted this suit to recover and to have declared his interest in the property.

Money to pay for the lease and to develop it was obtained from George W. James, and, to secure him in his advances, the certificate of sale was assigned to him, and later a deed was made directly to him by the commissioner. At the time of the first sale to appellee a small well had been brought in. Appellants drilled two other wells, which were also small producers. A fourth well was drilled to a greater depth, and the well thus brought in was of the capacity of 15,000 barrels of oil per day.

James was repaid his advances, and, on May 28, 1925, he reconveyed to appellants, who conveyed to the Smackover Petroleum Corporation. A conveyance was then executed by appellants and the Smackover Petroleum Corporation to the Phillips Petroleum Company for the consideration of $375,000, the vendors reserving all the oil which had been produced prior to the date of the conveyance.

Appellee's right to recover is resisted upon several grounds: (a) That the contract of October 28, 1924, set out above, was executed under a mutual mistake of fact, in that appellee was not the owner of the property with reference to which the contract was made; (b) that there was no trust in favor of appellee; (c) that the parol agreement in regard to the second sale was within the statute of frauds, and was void because it was not in writing; and (d) that appellee was barred by laches.

The court found in favor of appellee upon all these issues, and declared that all the persons through whose hands the lease passed, as stated, took title thereto subject to an existing trust in appellee's favor, except the

last purchaser and present owner, the Phillips Petroleum Company. Upon this finding, the court appointed a master to state an account of the profits and proceeds of the lease, and from the final decree confirming the master's report is this appeal.

We think the written contract of October 28 was not void as having been executed under a mutual mistake of fact. It is true that, when its terms were agreed upon, the parties were under the misapprehension that Bellmont had the title to the lease, which could and would be perfected when the terms of the sale had been complied with; but it appears that, after it was known the sale had been set aside, the parties proceeded under the written contract as amended, the essence of which, so far as appellee was concerned, was that he should have a fifth interest in the lease.

In support of the contention that there was no trust in appellee's favor, it is insisted that appellee had nothing to convey, and that the lease was not acquired under the agreement of October 28, and that the alleged subsequent agreement under which appellee says a trust in his favor arose was void because it was not in writing.

In reply to this contention, and to the contention that the parol agreement was within the statute of frauds, it is answered—and we think correctly so—that appellee made a very valuable contribution to the enterprise. It was through his investigation and survey and the information obtained as a result thereof that appellants were put in touch with this very valuable property, which has proved so enormously profitable to them, and the agreement of October 28 evidences that fact. It is true, as pointed out by counsel for appellants, that this agreement was amended, but this amendment went to the manner of acquiring the lease and did not change the relative interests of the parties. It may be that this amended agreement cannot be enforced as an express trust because it was not evidenced by a writing, but this change in the written agreement was not intended to eliminate appellee as a party in interest or to diminish his interest, and

his right to recover is not to be defeated because of the absence of a writing evidencing the supplemental agreement and which prevents the finding that there was an express trust.

The contention that appellee is barred by laches is based upon the fact that he made no contribution of money, while appellants used their credit to the extent of $56,000 in developing the lease, including the sum paid for it, and that, in addition, they gave the enterprise much of their time and attention, whereas appellee devoted neither time nor attention to the development of the lease. It is also insisted that, by his non-participation, appellee speculated, at the expense of appellants, on the outcome of the adventure.

In reply to this contention it is answered that the lease was at all times worth more than it cost, and before its development appellants were offered $60,000 for it. The development of the adjacent lands and the discovery of oil thereon proved the value of the lease and added to its value. Appellee testified that he had devoted several months of his time to the discovery of this property, and had spent about $2,500, including the expenses of his various trips to Illinois, in his effort to enlist appellants in the adventure. Appellants did develop the lease by drilling wells, but all the wells drilled were producers, and the money borrowed for this purpose was obtained on the security of the lease itself. The services rendered by appellants consisted in clearing the ground for the location of the wells and in arranging for the money to drill them. It does not appear that appellee was called upon to participate in this service or that he declined to render any aid for which he was asked.

The master, in stating the account between the parties, made a finding on the credits to which appellants are entitled, and it is not insisted that the account was not correctly stated if appellee is entitled to recover the interest claimed by him. Nothing was allowed appellee for his own time or for the expenses which he said he had incurred. Appellee brought this suit immediately

after being advised by appellants that he had forfeited his interest in the original agreement. We conclude therefore that the defense of laches is not sustained.

Respective counsel have filed briefs reviewing the decisions of this and other courts on trusts of various kinds. We do not review these decisions—not even those of our own court—as they are quite recent, and no useful purpose would be served by going into a subject which has been so thoroughly considered.

There is a contrariety of opinion among the members of the court, under the facts stated, as to the kind of trust created, but a majority are of the opinion that a constructive trust arose and that the decree of the lower court should be affirmed on that theory.

In the case of *Haskell* v. *Patterson,* 165 Ark. 65, 262 S. W. 1002, we quoted from 3 Pomeroy's Equity Jurisprudence, § 1044, the following statement of the law: "Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and, in most cases, contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal declaration of the trust. They arise when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership. As the trusts of this class are imposed by equity, contrary to the trustee's intention and will, upon property in his hands, they are often termed trusts *in invitum,* and this phrase furnished a criterion, generally accurate and sufficient, for determining what trusts are truly 'constructive.' An exhaustive analysis would show, I think, that all instances of constructive trusts, properly so-called, may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source. Even in that single

class where equity proceeds upon the maxim that an intention to fulfill an obligation should be imputed, and assumes that the purchaser intended to act in pursuance of his fiduciary duty, the notion of fraud is not invoked, simply because it is not absolutely necessary under the circumstances; the existence of the trust in all cases of this class might be referred to constructive fraud. This notion of fraud enters into the conception in all its possible degrees. Certain species of the constructive trusts arise from actual fraud; many others spring from the violation of some positive fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real, the necessary element of that unconscientious conduct which equity calls constructive fraud. Courts of equity, by thus extending the fundamental principle of trust—that is, the principle of a division between the legal estate in one and the equitable estate in another—to all cases of actual or constructive fraud and breaches of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property; they can follow the real owner's specific property, and preserve his real ownership, although he has lost, or even never had, the legal title, and can thus give remedies far more complete than the compensatory damages obtainable in courts of law. The principle is one of universal application; it extends alike to real and to personal property, to things in action, and funds of money.'' See also *Bray* v. *Timms*, 162 Ark. 247.

In the case of *Strasner* v. *Carroll*, 125 Ark. 34, 187 S. W. 1057, it was said: ''It is true the general rule is that a mere verbal agreement by which one of the parties thereto promises to buy in, at a judicial sale, lands of the other and hold same for his benefit, does not create a resulting or implied trust, the agreement itself being within the statute of frauds. There are, however, several well recognized exceptions to the rule, and one of them is that, where the purchaser of lands in which the other is interested becomes such under such a state of facts as

would make it a fraud to permit him to hold on to his bargain. *Trapnall* v. *Brown*, 19 Ark. 39; *McNeil* v. *Gates*, 41 Ark. 264; *LaCotts* v. *LaCotts*, 109 Ark. 335. In the first two mentioned cases the principle is announced that it would be a fraud in a purchaser, who obtained property at a price greatly below its value by means of a verbal agreement, to keep the property in violation of the agreement."

Appellee had an equity in the property when he made the agreement of October 28. He might have prosecuted his contract with the receiver and the residuary owner and have thus acquired the property. He might, by prosecuting an appeal from the order of October 20, have had that order set aside and the sale confirmed. But, whether this could have been done or not, he abandoned the pursuit of either course, pursuant to the amended agreement with appellants to let the property go to sale and buy it a second time. He refrained from bidding at the sale or from attempting to enlist any other person to do so.

Upon this point he testified that he had arranged with one Landau of Chicago to furnish the money to acquire this lease. But he did not close the contract with Landau because Carl Sundeen, who had put him in touch with appellants, advised that appellants were ready to proceed, and he closed with appellants rather than Landau, because he thought Sundeen had earned and was entitled to the commission promised him. Sundeen corroborates appellee in this statement. Appellants were permitted to bid at the second sale in reliance upon appellee's investigation and discovery, and they did bid, and bought the property under an agreement which contemplated that the purchase should inure to the joint and equal benefit of all the parties.

We conclude therefore that a trust existed in appellee's favor, and that the court below was correct in so holding.

Appellee has prosecuted a cross-appeal wherein he insists that his interest in the lease itself should be

declared and accorded him. He testified that the lease was sold for a grossly inadequate price, although the sale price was $375,000, and the proceeds of the sale of the oil before the sale of the lease brought the gross income of the property to $393,978.46, and there is testimony corroborating him in his estimate of the value of the lease.

The court found, however, that the lease sold for a fair price, and that the sale thereof should be confirmed, and we think this finding should be affirmed.

Appellee expressly states that he raises no question about his being charged with his part of the expenses of developing the lease, and the finding of the court below that he should be so charged is affirmed.

The report of the master found that the net value of appellee's one-fifth interest was $67,386.94, and judgment was rendered in his favor for that amount.

The correctness of that finding is not questioned, if it be conceded that appellee is entitled to receive a fifth of the net profits. The court below found that he was so entitled, and, as we concur in that finding, the decree of the court below is affirmed.

McCULLOCH, C. J., and HART, J., dissent.