OIL FIELDS CORPORATION v. DASHKO.

Opinion delivered April 11, 1927.

1. JOINT-STOCK COMPANIES AND BUSINESS TRUSTS—CONSTRUCTION OF CONTRACT.—A trustee under a common-law trust agreement *held* to have acquired oil property for the association for which he was trustee.

2. JOINT-STOCK COMPANIES AND BUSINESS TRUSTS—CONSTRUCTION OF CONTRACT.—A common-law trust agreement for the purpose of holding, developing and dealing in oil and gas properties *held* to impliedly prohibit the trustee from doing on his individual account any of the things for which the association was organized.

3. LIS PENDENS—COMMON-LAW AND EQUITY RULE.—The common-law and equity rule as to *lis pendens* has been superseded in Arkansas by Crawford & Moses' Dig., § 6979.

4. LIS PENDENS—EFFECT OF FILING.—Under Crawford & Moses' Dig., § 6979, filing for record a *lis pendens* notice does not deprive *bona fide* purchasers of property purchased before notice was filed.

5. LIS PENDENS—EFFECT OF FILING.—Failure of a *bona fide* purchaser of real estate from the defendant in an action to record the evidence of his title before a *lis pendens* notice was filed will not have the effect of depriving him of his title or give plaintiff in such action superior right or title.

6. VENDOR AND PURCHASER—NOTICE.—A party claiming real estate as against a purchaser thereof for value has the burden of showing that such purchaser had notice, either actual or constructive, of such claimant's rights.

7. LIS PENDENS—PAYMENT OF CONSIDERATION BY PURCHASER.—A *bona fide* purchaser paying a valuable consideration for land before notice of *lis pendens* was filed will be protected.

Appeal from Ouachita Chancery Court, Second Division; *George M. LeCroy,* Chancellor; affirmed.

*Albert L. Wilson,* for appellant.

*Powell, Smead & Knox,* for Dashko; *Mahony, Yocum & Saye,* for Southern Crude Oil Purchasing Co., appellee.

WOOD, J. This appeal is by the Oil Fields Corporation, hereafter called appellant, against John S. Dashko, T. P. Novick, Olga Novick, Anna B. Ingalls, G. W. Ferguson, Laura Ferguson, E. C. Alley, Granville Alley, John Alley, as Alley & Son, and the Southern Crude Oil Purchasing Company (hereafter called purchasing company). The question to be determined is whether or not the appellant is the owner of an oil and gas lease covering the east half of the southwest quarter of the northwest quarter of section 34, township 15 south, range 15 west, Ouachita County, Arkansas, and the oil and gas produced therefrom since October 12, 1923.

The appellant claims to be the owner of the oil and gas lease by assignment from John S. Dashko, as trustee of the Business Men's Royalty Association. The assignment was executed and delivered October 12, 1923, and was filed for record with the clerk of the circuit court and

ex-officio recorder of Ouachita County, Arkansas, July 24, 1924, at 5 o'clock P. M., and was duly recorded in his office in book 45, page 121. The purchasing company claimed to be the owner of the lease and the production thereof since May 8, 1925, under a conveyance executed that day by T. P. Novick to the purchasing company. On April 22, 1922, John S. Dashko organized a common-law trust under the name of the Business Men's Royalty Association, hereafter called royalty association. John S. Dashko is designated in the trust instrument as the trustee of the estate. The trust instrument was recorded in Union County, Arkansas, May 8, 1922, but was not recorded in Ouachita County, where the land in controversy is situated. Three similar trusts were also organized with other parties designated as trustees. The trust instruments consist of 21 articles. The purpose of these trusts is similar, and it is defined in article 8 of the instrument under which the royalty association was created as follows:

"The purpose of this trust shall be to hold the above and foregoing described oil and gas lease and any other oil and gas leases or property, real and personal, that may be acquired by this trust estate, and further to do all the necessary and incidental things for the operation, maintenance and development of such properties, consisting of the following acts: (2) To drill for, produce, refine and market petroleum and its products, and natural gas. (b) To buy, sell, lease, exchange and barter oil and gas leases, royalties and mineral rights. (c) To buy, sell and barter crude and refined oil and petroleum products. (d) To buy, sell and barter and exchange chattels and personal property of every kind and character, necessary and incident, remote or proximate, for the effective execution and accomplishment of the purposes above mentioned. (e) To buy, sell, trade and exchange real estate and chattels real necessary and incident to the above and foregoing purposes, and by these articles the trustee is authorized and empowered to do any act and thing authorized by law, in order to

promote, effect and procure the purposes of this trust, as herein enumerated.''

The money with which the property was acquired for the trust estate was raised by soliciting the public to invest therein in amounts of $10, and multiples thereof, paid to the trustee, and, as evidence of such investment, the trustee issued certificates to the beneficiaries showing the amount of the investment in the trust estate. The sum of $1,789,223.75 was invested by the public in this manner in the four trusts. They were all operated from the same office in El Dorado from May 8, 1922, until October 12, 1923, at which time they were legally merged into the Oil Fields Corporation, the appellant, which had been previously organized for that purpose.

Article 16 of the trust instrument provides that all conveyances to the trustee of the estate shall read in the name of Business Men's Royalty Association, in the name of the trustee therefor, and all conveyances from such trustee shall read ''Business Men's Royalty Association,'' by the trustee therefor, and likewise all written instruments pertaining to this trust shall be so executed. Almost unlimited power is given to the trustee. He had the sole management and control of the entire trust estate, having the power to sell or pledge the same and to distribute the proceeds derived from its operation among the beneficiaries in a manner wholly within his discretion. He received such compensation for his services as trustee at such times as, in his discretion, he elected to receive, and was to be reimbursed for any expenses incurred by him in the conduct of his duties as trustee of the estate. In addition to such reasonable compensation as he might elect to award himself, the instrument also provides that the trustee shall be entitled to 10 per cent. of all the profit made from the sale of any lease or leases, or of the profits made from the production of any oil well or wells which may be brought in during the life of this estate. There is a further provision in the trust instrument to the effect that the purpose of the articles was to create an express and active trust, the

management and execution of which was wholly within the discretion of the trustee, without voice and control by any *cestui que trust* whomsoever, but it is also expressed that there was a fiduciary relation created and existing by virtue of the articles; that the beneficiaries were non-associated with the trustee and with each other. There was a provision also to the effect that, if any article of the trust should be declared invalid, such adjudication should not affect the rest of the trust declaration, nor should any construction be placed upon the instrument which should curtail the right of the trustee to manage the trust estate independent of the beneficiaries.

On May 16, 1922, T. C. Joyce executed an oil and gas lease to M. P. Morton, trustee, covering the property in controversy. On August 12, 1922, Morton, trustee, assigned the oil and gas lease to John S. Dashko, in his individual capacity. This assignment was duly recorded on August 18, 1922. On November 15, 1923, Dashko executed an assignment of the lease in controversy to T. P. Novick, his brother-in-law. This assignment was filed for record on March 7, 1924. On May 12, 1925, Novick executed an assignment of the lease to the purchasing company, which instrument was filed for record at 3:45 P. M. of that day.

The merger instrument signed by John S. Dashko, trustee of the royalty association, for the consideration therein named, conveyed unto the Oil Fields Corporation "all of the property and assets of every kind and description of the trust estate, including oil and gas leases and the equipment, wherever situated, and all funds on hand, oil in storage, and all sums due or to become due and payable to the said John S. Dashko, as trustee of the said trust estate, and hereby agrees to execute all necessary assignments and conveyances to convey all the said property unto the said Oil Fields Corporation in exchange for a sufficient amount of its capital stock, at par, to equal the par value of the beneficial certificates, known as trustee's certificates, now issued and outstanding." On October 20, 1923, John S. Dashko, in compliance with the

merger instrument, executed two specific assignments, in one of which he conveyed to the appellant all the property of the royalty association situated in Ouachita County, Arkansas, and in the other all the property situated in Union County, Arkansas. But in neither of these is the property in controversy mentioned or described. No property is conveyed in these specific assignments as belonging to the royalty association except a royalty interest, or an overriding royalty interest. One of these assignments was filed for record on November 6, 1923, and the other on November 8, 1923.

Out of this voluminous record of more than twelve hundred pages we deem it unnecessary, and it would unduly extend this opinion, to set forth in detail either the pleadings or the testimony. Suffice it to say it is only necessary to discuss and decide two issues presented by the record. First, was John S. Dashko the owner of the oil and gas lease in controversy at the time the same was assigned to the purchasing company? Second, if, as between the appellant and Dashko, the appellant, in equity, was the owner of the property in controversy at the time of the assignment thereof to the purchasing company, nevertheless was the purchasing company an innocent purchaser thereof?

1. Was Dashko the owner of the property in controversy? We have set forth the essential provisions of the trust instrument under which the appellant deraigns title. Even if the trust instrument should be construed as not to prohibit Dashko from acquiring gas and oil leases in his individual capacity while he was conducting the business of the trust, still we are convinced that a preponderance of the evidence shows that he acquired the property in controversy for the royalty association of which he was the trustee. But, while the trust instrument does not in express terms prohibit Dashko, as an individual, from doing the things set forth in article 8, nevertheless it occurs to us that the instrument should be construed as prohibiting him from doing any of the things therein specified on his individual account and

for his individual advantage and profit.    An analysis of
the various separate provisions of the trust instrument
and of the instrument as a whole shows that, while the
trustee had unlimited power and discretion in the matter
of the acquisition, management and disposition of the
trust property, and the distribution of the proceeds
thereof, independent of any voice or control of the bene-
ficiaries of the trust, nevertheless the trust instrument
itself declares that a fiduciary relation was created and
existing by virtue of the trust articles, and that Dashko
was the trustee of an express and active trust and was to
conduct, manage and control the estate to the best inter-
ests of the beneficiaries of the trust.

Without reiterating the various provisions of the
trust instrument and going into a critical analysis
thereof, we are convinced that it was the intention of
the trustee, Dashkô, in the creation of this trust, to
impress the public who might invest funds in the enter-
prise that, from the time of the execution and recording
of the instrument, he was to be engaged, as set forth in
article 8, for the exclusive and sole benefit of those who
might invest their money and procure certificates evi-
dencing their interest and ownership in the trust estate.
Certainly those who became beneficiaries under the terms
of the trust instrument had the right to expect the trustee,
so long as he was engaged in the character of business
set forth in article 8 of the trust instrument, to conduct
same not for his individual and private account, but
solely for the beneficiaries.    In other words, the trustee,
Dashko, was the agent and trustee of the beneficiaries
under this instrument to do the things set forth in article
8 of the trust instrument for them.    The beneficiaries fur-
nished the capital with which Dashko was to conduct the
business set forth in article 8 for them, and for which he
was to receive compensation for his services in the dis-
charge of his duties as such trustee, as set forth in article
17 of the instrument.    The clear implication from that
article (17), as well as others, is that the trustee is not
to expend any money for his own profit and advantage

in conducting the business of the trust as set forth in article 8. After making the provision for necessary overhead expenses, such as maintenance of offices, hiring of labor, hiring of necessary legal counsel, article 17 further provides.that he shall be entitled to reimbursement to the extent of any reasonable expense incurred in the conduct and discharge of his duties as trustee. It is clearly implied that, if the trustee expended any of his individual funds in the conduct of the business of the trust, he was to be reimbursed out of the trust fund.

In the case of *Haskell* v. *Patterson,* 165 Ark. 65, 262 S. W. 1002, there was a provision in the trust instrument to the effect that the trustees should keep all conveyances running to them for the benefit of the syndicate in a separate receptacle and that they should designate in red ink the documents or property of the trustees individually. In that case we held that, under the above provision, the trustees were not prohibited from investing their own funds in the acquisition of property, because the trust instrument, at least by implication, permitted it. It will be observed that there is no such provision in the trust instrument under review here. In the absence of some such provision we are convinced that it was in the contemplation of the parties to this instrument that the trustees should not have such authority, and it is impossible to escape the conclusion that he could not exercise such authority without being disloyal to his trust. In the case of *Haskell* v. *Patterson, supra,* speaking of the trust instrument, we said: "It is certain that it was not the intention of any of the parties to create a twilight zone of uncertainty in the management of the affairs of the syndicate, in which it might be difficult to discern just when Haskell was representing the syndicate and when he was representing himself. The instrument as a whole shows clearly that it was the intention of all parties that the trustees should give their first thought to the interests of the syndicate. The trustees were to devote their time and services to the syndicate, in consideration of the funds placed in their hands for investment and manage-

ment and the opportunities thus afforded them to make money both for themselves and the syndicate.  * * * While, under the trust instrument, there was nothing to inhibit Haskell from acquiring leases individually, yet it must be held, under all the facts of this record, that he did not do so." We further said: "We regard the proof as clear, decisive and convincing that Haskell acquired the properties in controversy under circumstances which constitute a constructive trust, and it would be a fraud on the members of the syndicate to allow him to hold them in his individual right. Under the doctrine announced by Mr. Pomeroy above, the law superimposes upon his transactions the trust relation, and he holds title to the leases in controversy in trust for the syndicate, and must account to the syndicate for his dealings in the premises."

We reach the same conclusion here as to Dashko, and regard the facts of this record even stronger to justify that conclusion than were the facts in the case of *Haskell v. Patterson, supra.* In the absence of language authorizing it, certainly no instrument of the character of that under consideration should ever be so construed as to permit a trustee, in the conduct of the business of his trust, to elect to make a good bargain for himself, when, by fidelity to his trust, he could make the same good bargain for the benefit of the beneficiaries of the trust. The law removes the trustee from such temptation to cupidity and unfaithfulness while in the conduct of the business of his trust by requiring him to serve only the one master—the beneficiaries in the trust—and not himself. Mr. Pomeroy says:

"The duty not to accept any position or enter into any relation, or do any act inconsistent with the interests of the beneficiary, is a rule of wide application and extends to every variety of circumstances. It rests upon the principle that, as long as the confidential relation lasts, the trustee or other fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any other position which would subject

him to conflicting duties or expose him to the temptation of acting contrary to the best interests of his original *cestui que trust.* The rule applies alike to agents, partners, guardians, executors and administrators, directors and managing officers of corporations, as well as to technical trustees. The most important phase of this rule is that which forbids trustees and all other fiduciaries from dealing in their own behalf with respect to matters involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealing. It is therefore a gross violation of his duty for any trustee or director, acting in his fiduciary capacity, to enter into any contract with himself connected with the trust or its management. Such a contract is voidable, and may be defeated or set aside at the suit of the beneficiary." 2 Pomeroy Eq. Jur. 2473, § 1077. We conclude therefore that, as between John S. Dashko and the appellant, the title to the property, in equity, was in the appellant, and not in Dashko, at the time Dashko entered into the escrow contract by which the property was to be conveyed, and was conveyed, from Novick to the purchasing company.

2. Such being the case, we come now to the issue of whether or not the appellee purchasing company was an innocent purchaser of the oil and gas lease in controversy. On the 13th of February, 1924, an action was instituted in the chancery court of Ouachita County by Frank W. Lowe, one of the beneficiaries of the common-law trust, against Dashko *et al.* and the appellant. The complaint charged, in substance, that the trustees of the common-law trust had fraudulently organized the appellant and fraudulently conveyed it all the properties of the four trusts. The prayer was for a receiver to take charge of the properties and that the same be sold to satisfy the claims of the beneficiaries. Summons was issued on the day the complaint was filed against all the defendants in that action. The appellant, in its answer of July 21, 1924, denied the allegations of the complaint, and set up, in substance, that it had been duly incorporated and was

authorized to do business in Arkansas, and that the common-law trusts and all their properties had been consolidated and merged into the appellant and all of their properties conveyed to the appellant; that, if any properties had not been conveyed by specific assignment, same should have been so conveyed, and the defendant corporation prayed that all the property belonging to the trusts be decreed as property belonging to the appellant.

On May 12, 1925, the appellant filed what is designated its "supplemental answer and cross petition," in which it set up, among other things, in substance, that, under the merger agreement, all the properties of the trust were to be conveyed to the appellant by specific assignments executed by the trustees; that the property in controversy was the property of the Business Men's Royalty Association, and that John S. Dashko, with the intent to defraud the appellant, omitted the same from the specific assignment, and that he did, on November 15, 1922, transfer the property in controversy to T. P. Novick without any consideration, and that T. P. Novick received the assignment with full knowledge that the property in controversy had belonged to the Business Men's Royalty Association. In short, the appellant charged that Dashko had conveyed the property in controversy to his brother-in-law, T. P. Novick, with the intent to defraud the appellant, and the appellant prayed that the court direct the receiver to take possession of the property in controversy and the oil and gas produced therefrom, and that, upon final hearing, the title thereto be declared in appellant. On the same day, at 3:30 P. M., the appellant filed in the office of recorder of deeds of Ouachita County a *lis pendens* notice that the property in controversy was being claimed by the appellant. On May 21, 1925, the appellee purchasing company filed its motion praying the court to permit it to intervene and setting up that it was the owner of the property in controversy by purchase thereof from T. P. Novick for a valuable consideration, without notice of any claim of the appellant, and that the appellant was in the hands of a receiver

and had no power to prosecute the action to determine the validity of the intervener's title in the receivership proceedings, and that the receiver had not done so; that T. P. Novick, from whom it purchased, had been in possession of the property since November 15, 1922, and had expended large sums of money in developing that property, without notice of any claim of appellant. The purchasing company moved the court to require the receiver to institute an action to determine the title of the land in controversy, and prayed the court to strike the supplemental answer and cross-petition of the appellant. A similar intervention and motion was filed by T. P. Novick on June 12, 1925, and, on the same day, the appellant filed its response to these motions, denying their allegations and reiterating its claim of ownership as set forth in its supplemental answer and cross-petition.

The court heard these motions on June 12, 1925, and entered an order directing that the supplemental answer and cross-petition of the appellant be severed and that same should be treated as a complaint in an independent action in which the receiver should join to determine the ownership of the property in controversy. The court thereupon directed that the purchasing company, T. P. Novick, J. S. Dashko and all the other defendants mentioned in the supplemental answer and cross-petition be required to file their answer thereto within twenty days. After this, further lengthy pleadings were filed by the purchasing company, Dashko, and Novick, and a reply thereto by the appellant, all of which raised the issues as set forth above, only in greater detail.

We have already determined the issue as between the appellant and Dashko—that appellant was, in equity, the owner of the property in question—and have set forth above so much of the pleadings as is necessary on that issue and also on the remaining issue of whether or not the purchasing company was an innocent purchaser of the property in controversy. It will be noted that, while the appellant and Dashko were parties defendant in the action by Lowe to have a receiver appointed for appel-

lant, appellant, in its answer to that action, filed July 21, 1924, does not make its answer a cross-bill against Dashko and ask that the deed conveying the title to him in his individual capacity to the property in controversy be canceled; nor did the appellant on that day ask that T. P. Novick be made a party defendant and that the deed of Dashko to Novick be canceled.  Appellant did not on that day, in its answer, describe the property in controversy and pray for a cancellation of the record title in Dashko and Novick and that the appellant, as against them, be declared the owner of the property.  Nor did the appellant, when it filed its answer on July 21, 1924, to Lowe's action against it and Dashko, file a *lis pendens* notice concerning the property in controversy. Our *lis pendens* statute provides, in substance, that, to render the filing of any suit at law or in equity, affecting the title of real estate or personal property, constructive notice to *bona fide* purchasers, it is necessary for the plaintiff, his attorney or agents, to file for record with the recorder of deeds of the county in which the property to be affected is situated a notice of pendency of such suit, setting forth the title of the cause and the general object thereof, together with a correct and full description of the property to be affected thereby and the names of the parties to the suit and the style of the court where the suit is pending.  Section 6979, C. & M. Digest.  The common-law and equity rule of *lis pendens* has been abrogated in this State by the above statute.  Since then an action in this State affecting the title is not *lis pendens* until a notice has been filed in compliance with the statute.  *Henry Wrape Co.* v. *Cox,* 122 Ark. 445, 183 S. W. 955; *Steel* v. *Robertson,* 75 Ark. 228, 87 S. W. 117; *Hudgins* v. *Shultice,* 118 Ark. 139, 175 S. W. 726; *Jones* v. *Ainell,* 123 Ark. 532-536, 186 S. W. 65.

Under the *lis pendens* statute and our cases construing it, the appellee purchasing company had no constructive notice that the record title of Dashko and Novick to the lands in controversy was being challenged or disputed by the appellant until the filing of the *lis pendens* with the

recorder of deeds at 3:30 p. m. o'clock on May 12, 1925. The effect of filing for record of the *lis pendens* notice, under the statute, is to protect the rights of the plaintiff in the action against those who may acquire title to or liens on the property from the defendant after the *lis pendens* notice has been filed for record. The filing for record of the *lis pendens* notice cannot have the effect to deprive *bona fide* purchasers of the property purchased before notice of *lis pendens* was filed for record. If one in good faith purchases real estate from a defendant in an action before the filing for record of the *lis pendens* notice, a failure to record the evidence of his title thus acquired until after the *lis pendens* notice has been filed for record will not have the effect to deprive him of his title or give the plaintiff in the action superior right or title. The plaintiff in the action, by recording the *lis pendens* notice, cannot acquire any greater right in the property than the defendant had therein at the time the *lis pendens* notice was filed. In other words, a *lis pendens* operates prospectively to preserve all the rights of the plaintiff as against the defendant in the litigation from the time the *lis pendens* notice is filed for record. But it cannot operate retroactively to divest the title of one to whom the defendant had conveyed the property prior to the filing of the *lis pendens* notice for record, even though such person has not recorded his muniment of title until after the filing for record of the *lis pendens* notice.

The above is necessarily the effect of *lis pendens* in the light of our decisions interpreting the meaning of the statute. In *Jones* v. *Ainell, supra,* we said: "A suit affecting the title or any lien on real estate is not *lis pendens* until notice of the pendency of the action is filed in accordance with the statute." The doctrine of *lis pendens* had its origin in the common law. It was a rule of the common law that, if the defendant in a suit affecting his real property, aliened the same during the pendency of a suit, the judgment at law or decree in chancery overturned the alienation. In 17 R. C. L., at page

1011, § 3, it is said: "The doctrine of *lis pendens* had its origin in the civil law, and was pungently stated in the legal maxim, *pendente lite nihil innovetur.* The doctrine, as it prevails at this time, seems to have had its origin in the common-law rule which obtained in real actions, where, if the defendant aliened during the pendency of the suit, the judgment in the real action overreached the alienation. The rule is thus older at law than in equity, and was adopted from the common-law courts by Lord Bacon as one of his ordinances for the better and more regular administration of justice in the court of chancery. This ordinance provides 'that no decree bindeth any that cometh in *bona fide* by conveyance from the defendant, before the bill is exhibited, and is made no party by bill or order; but, when he comes in *pendente lite,* and while the suit is in full prosecution, and without any color of allowance or privity of court, there regularly the decree bindeth.' " It is further said, at page 1036, § 32: "When a defendant in an action by a cross-complaint sets up affirmative rights and prays for affirmative relief against the plaintiff, the *lis pendens* begins from the filing of such cross action or cross-complaint, and not from the commencement of the plaintiff's action."

In *Cherry v. Dickerson,* 128 Ark. 572-578, 194 S. W. 690, we said: "The statute of this State on the subject of *lis pendens* is but declaratory of the common law, restricted to written notice of the pendency of the action which must be filed with the recorder of deeds." See also *Bailey v. Ford,* 132 Ark. 203, 200 S. W. 797.

It is further stated in 17 R. C. L., at page 1009, § 2: "If any of the parties, after the *lis pendens* has become operative, attempts any transfer of the subject-matter of the litigation, or to create any incumbrance or charge against it, or to enter into any contract affecting it, or to deliver possession of it to another, the action or suit may proceed without taking any notice whatever of such transfer, incumbrance or change in possession and the final judgment or decree, when entered, may be carried

into effect, notwithstanding the attempted dealing with the subject-matter thereof.''

The undisputed testimony shows that negotiations for the purchase of the property in controversy by the purchasing company were begun by its attorney, J. K. Mahony, with Dashko on the night of May 8, 1925, and were concluded on the morning of May 12, 1925. A contract of sale and purchase of the property in controversy had been entered into between Dashko and Novick and the purchasing company. Novick had executed a conveyance or assignment of the property in controversy, and these papers were left in the hands of J. K. Mahony. On the morning of May 12, 1925, Mahony delivered to Hamp Smead, attorney for Dashko and Novick, the check of the purchasing company for $185,000 and placed the assignment in the hands of his partner, Saye, who carried the same to Camden, where it was filed for record at 3:45 P. M. of that day. The consideration specified for the assignment was the sum of $185,000 in cash and $65,000 payable out of seven-sixteenths of the oil produced from the lease. The testimony of Mahony shows that the check and the assignment were delivered and the agreement for the completed purchase was made at 11 o'clock A. M. on May 12, 1925. Upon the above facts, and under the above authorities, we conclude that the purchase of the property in controversy by the purchasing company of T. P. Novick, who held the record title, was consummated before the appellant filed its *lis pendens.*

In its pleadings the purchasing company alleged that it was a *bona fide* purchaser of the property in controversy without notice. The appellant denied this, and alleged that the purchasing company had notice, both constructive and actual, that the appellant was the owner of the property in controversy at the time of the purchasing company's pretended purchase. As we have seen, the purchasing company had no constructive notice of appellant's title, but, to constitute the purchasing company an innocent purchaser for value, it must also appear that, at the time it paid the consideration and completed

the purchase of the property, it had no actual notice of appellant's claim of title. In *Jennings* v. *Bouldin,* 98 Ark. 105, 109, 134 S. W. 948, we said:

"One who purchases, having actual notice of the pendency of the suit, cannot avail himself of the failure to give the *lis pendens* notice required by the statute." In *Henry Wrape Co.* v. *Cox, supra,* we said, at page 448:

"If the plaintiff took the quitclaim deed from its immediate grantor without notice of an outstanding conveyance or obligation respecting the property, or notice of facts which, if followed up, would have led to knowledge of such outstanding conveyance or equity, it was entitled to protection as a *bona fide* purchaser, upon showing that the consideration stipulated had been paid and that such consideration was a fair price for the claim or interest designated."

In *Osceola Land Co.* v. *Chicago Mill & Lbr. Co.,* 84 Ark. 1-10, 103 S. W. 609, we said:

"But a further consideration of the case has convinced us that the statement that the burden is on the party claiming to be a *bona fide* purchaser to show want of notice is not correct as a general rule; for, when the party relies on the defense of being a *bona fide* purchaser, and shows that he has paid a valuable consideration, the burden of showing that he purchased with notice is on the party alleging it or who relies on the notice to defeat the claim of *bona fide* purchaser." (Citing cases).

In *Jones* v. *Ainell, supra,* we said, at page 537:

"The plaintiff in his complaint alleged that he was a *bona fide* purchaser of the land, and it is shown that he paid a valuable consideration for it. The burden of showing that he purchased with notice was on the party alleging it or who relies on the notice to defeat the claim of *bona fide* purchaser."

Since the purchasing company proved that it purchased the property and paid a valuable consideration therefor, and since the appellant relies on notice to defeat such claim of *bona fide* purchaser, it devolved upon the

appellant to show that the purchasing company had notice. As already seen, appellant has failed to prove constructive notice, and we are now to determine whether it has proved that the appellee purchasing company had actual notice.

In *Richards* v. *Billingslea,* 170 Ark. 1100, 1104, 282 S. W. 985, we said: "This court has held that whatever puts a party on inquiry amounts to notice where the inquiry becomes a duty and would lead to knowledge of the requisite facts by the exercise of ordinary diligence and understanding." Citing *Jordan* v. *Bank of Morrilton,* 168 Ark. 117, 269 S. W. 53; *Walker-Lucas-Hudson Oil Co.* v. *Hudson,* 168 Ark. 1098, 272 S. W. 836.

Now there is no testimony in the record tending to prove that the appellant gave any actual notice to the appellee that the property in controversy was claimed by the appellant. The only inquiry, then, is whether or not the appellee, prior to its purchase, had notice of sufficient facts to put it upon inquiry, which, if pursued with due diligence, would have advised the appellee of appellant's claim. What course would a prudent person take before he purchased the property in controversy? The first step would be to have an abstract made of the record title. This was done. The appellee employed the law firm of Mahony, Yocum & Saye to procure and pass upon the abstract of title, and they approved the same. The undisputed testimony shows that they were justified in such approval, for the record of deeds showed a complete record title in Novick. If it could be said that prudent attorneys, under the circumstances, should have looked to the court records to determine whether the property in controversy was involved in any litigation in which appellant was claiming the same, what would these records have shown? They would have disclosed that an action was pending in which Dashko and the appellant were parties defendant, the purpose of which was to place all of the gas and oil leases and the products thereof belonging to the appellant in the hands of a receiver, and that appellant, in answering the complaint in that case,

had not made its answer a cross-action against Dashko, claiming, as against him, to be the owner of the property in controversy and asking affirmative relief against Dashko. Prudent attorneys, upon examination of the pleadings in that action, might have well concluded that, if the appellant had intended to challenge the title of Dashko and of Novick, it would have set up and declared its rights as against Dashko and Novick, and that, since it·had not done so, the record title of Dashko and Novick was not questioned in that litigation by appellant. If it could be said that prudent attorneys would and should have gone further and inquired of those in possession of the property in controversy as to the title, such inquiry would have discovered, so far as Dashko was concerned, that he had claimed to own the property in his own right from the time that he had purchased the same in August, 1922; that he had assigned the lease to Novick as early as November 15, 1923; that Novick had been in possession of the property and began drilling operations thereon as early as May 4, 1924; that a producing well had been brought in on the property on July 4, 1924; that Novick and Dashko were still in possession of the property, which was producing large quantities of oil; in short, that they were claiming the ownership, and had complete possession and control of the property and the production thereof. Inquiry of them would only have elicited the information that their rights to own and control the property in controversy and the production thereof had not been called in question by the appellant through its local director and attorney, nor by the receiver who had been appointed to take charge of its property. It occurs to us that prudent attorneys, under these circumstances, had the right to conclude and to advise their client, the appellee purchasing company, that the title in Novick, as evidenced by the record, was perfect. Our conclusion therefore is that the appellee purchasing company, at the time of its purchase of the property in controversy, had neither actual nor constructive notice of the claim of the appellant thereto.

The appellant contends that the appellee was not an innocent purchaser because the $65,000 payable out of seven-sixteenths of the oil to be produced had not been paid and that the $185,000 was by check, payment on which could have been stopped after *lis pendens* notice was filed for record. These contentions are untenable, for the reason that the undisputed evidence shows that the check was cashed before the *lis pendens* was filed for record, and this payment of $185,000 in cash was ·by far the greater part of the consideration. That part of the consideration payable only out of oil to be produced could not have been paid before the purchase was completed and might never be paid at all. It was not contemplated and not essential that it should be paid before the purchase could be consummated. To be sure, there must not only be a valuable consideration in fact, but there must be an actual payment of valuable consideration before the filing of the *lis pendens*. 2 Pomeroy, Eq. Jur. 750-751. The payment of $185,000 in cash before *lis pendens* notice was filed for record constituted a valuable consideration. The case of *Marchbanks* v. *Banks,* 44 Ark. 48, has no application, because in that case the purchaser had not paid the greater part of the consideration.

It is contended that, because Dashko was the trustee of the Business Men's Royalty Association in conformity with the declaration of trust, he had no title which he could convey. But the undisputed evidence shows that, when Dashko purchased the land in controversy, he took title thereto in his individual name and that record title at the time he sold the same to Novick was in Dashko as an individual and not as a trustee. The record title to the land in controversy therefore was in Novick at the time appellee purchased the same. The case of *Murphy* v. *Steele,* 169 Ark. 299, 274 S. W. 6, upon which counsel for appellant relies to sustain this contention, has no application here, for the reason that, in that case, we held that "the beneficiaries under a deed conveying the legal title to a trustee can have no greater rights or

equities against the grantor than their trustee who holds the legal title.'' That case is wholly unlike the case at bar. There the legal title was conveyed to the trustee as such.

We pretermit any discussion or decision of the issue as to whether or not appellant would be barred by laches from obtaining a personal judgment against Dashko and Novick, or both of them, for the amount of the consideration received by either or both of them as the purchase price of the property in controversy. Appellant did not, in its pleadings, ask for such specific relief against Dashko and Novick in the event that this court should uphold the purchase by the appellee purchasing company, and the trial court was not asked to award to the appellant any such alternative relief, and such relief has not been asked here.

We have not overlooked the other contentions so elaborately and ably argued by learned counsel for the appellant. We have carefully considered all of them, and do not concur in the views of counsel that appellee purchasing company is a monopoly and for that reason could not maintain this action; nor do we agree with counsel in the contention that the appellee, at the time of the purchase of the property in controversy, had not complied with the laws of this State permitting foreign corporations to transact business in this State, and therefore could not maintain this action. Because of the already too great length consumed in the consideration of what we deem to be the vital issues of this lawsuit, we refrain from discussing those issues raised and urged which we have found unimportant and unnecessary to a decision of the cause.

Our conclusion upon the whole record is that the appellee is an innocent purchaser for value of the property in controversy. Therefore the decree of the trial court dismissing the appellant's complaint against the purchasing company for want of equity is affirmed.