STATEMENT BY THE COURT.
This suit was brought by appellant, C. M. Wofford, against the Twin City Brick Tile Company, a common-law trust, J. T. Wilkins, Oresta Wilkins and the other trustees of the common-law trust, and Eula Wilkins, wife of O. Wilkins, to recover an indebtedness due the appellant, a sum of money owing from the Twin City Brick Tile Company to him, because of his having to pay indorsements of said company's paper for borrowed money, J. T. Wilkins and O. Wilkins being also indorsers on the paper.
Judgment was rendered against J. T. and O. Wilkins for their contributive share of the indebtedness.
It was alleged in the complaint, admitted by the answer and shown by the testimony that appellee brick company was a common-law trust engaged in the manufacture and sale of brick in Crawford County in April, 1925, and that it continued actively in such work until September. 1929, after which time it ceased operations, except to conduct the business of selling brick manufactured by others and collecting its debts.
It was alleged that the defendant, O. Wilkins, purchased the 10 acres of land upon which the trust owned *Page 163 
a lease and upon which its manufacturing plant was situated and had taken the deed in the name of his wife, Eula Wilkins, the appellee. That he purchased the 10 acres from W. T. Jacobs about July 25, 1925, paid $800 therefor, and caused a deed to be made conveying it to his wife, Mrs. Eula Wilkins; alleged also that O. Wilkins was not entitled to purchase said lands as against the Brick Tile Company, and that the purchase thereof must be taken and considered the purchase of the company, and that the Brick Tile Company in equity should owe Eula Wilkins and O. Wilkins the $800 purchase money with interest from the date of purchase. That the said Eula Wilkins had received royalties from the rent of said land in the sum of $1,364.84, which should be credited against the $800 with interest, purchase money, and the difference standing upon the company's books in her favor as unpaid royalties $1,240 should be canceled.
Mrs. Eula Wilkins denied the allegations in regard to the purchase of the 10 acres of land as alleged in the complaint and amendment thereto; denied that the same was purchased from W. T. Jacobs, and that it was purchased by O. Wilkins; alleged that she purchased same out of her own funds, and that the defendant, O. Wilkins, had no right, title or interest in the thing. By cross-complaint alleged that in July, 1925, the 10 acres was leased with other lands to the Brick Tile Company by Jacobs, and under the lease he was to receive 6 cents per ton, 2,000 pounds, for all shales taken from the lands for the purpose of manufacturing brick. That in July, 1925, there existed against all the lands belonging to Jacobs a mortgage of about $800 which was about to be foreclosed, and that he offered to sell the 10 acres in question for the sum of $800 in order to clear the lands of the mortgage, and at the request of the said trustees of the Twin City Brick Tile Company and with their knowledge and consent the lands were purchased for said sum and paid for out of her separate property. That there *Page 164 
had been taken from said lands for the purposes of manufacturing brick about $200 worth of shale, which she acquired the right to under her purchase, the company being indebted to her for this amount in addition to other indebtedness set out. She alleged that the company paid royalties, but failed to keep the payments due paid up as they accrued, and that there was due her for shale taken from the lands approximately $1,300, beside the $200 alleged. She alleged also that a large quantity of unburned bricks were on hand when the receiver took charge, and that she was due royalties thereon not shown on the books of the company, and she was entitled to hold the brick for the royalties and entitled to a lien therefor; and asked that a lien be declared in her favor to the extent of the indebtedness found to be due her, and that the bricks be sold separately and the proceeds thereof held subject to her prior rights.
The allegations of the cross-complaint were denied so far as they affected the appellee company's rights.
A receiver was appointed, and the court found that O. Wilkins and J. T. Wilkins were trustees of the common-law trust operating the brick manufacturing plant, which was located upon the 10 acres before the trust was organized and taken over by purchase from former owners. That the trust is the owner of a leasehold estate in the land in question, the remainder in fee being owned by Eula Wilkins, who purchased the same with her own money, and from the date of its purchase she succeeded to the rights of the grantor and had received from time to time under the lease a rental or royalty from the trust without question and presumably with knowledge of all. She was also given a lien on the brick and materials and products on the premises to secure a royalty due her against the trust and any general creditors, etc. On final hearing the court found that neither the plaintiff nor the brick company had any interest or claim in or to the fee simple title to the 10 acres of land purchased from W. T. Jacobs, but only a leasehold interest in said lands. Judgment *Page 165 
was rendered accordingly for various and varying amounts, and it was decreed that the fee simple title to the 10 acres of land was in Eula Wilkins subject to the leasehold estate, and from this decree the appeal is prosecuted.
The nature of the business for which the trust was organized is as follows:
"To buy, own, lease or otherwise acquire lumber lands, coal lands, fire clay and other mineral lands and to lease, to buy, own, sell coal, fire clay, other mineral leases and rights; to prospect, drill, bore and sink shafts for coal, fire clay, shales and other minerals, and merchandise and by-products. To carry on the business of mining, producing, concentrating, manufacturing, storing, transportation, buying, selling, and deal in coal, minerals, fire clay and its by-products; to construct, own, lease or otherwise acquire, maintain and operate, factories, concentrators, warehouses, and other similar facilities, laboratories and houses and hotels for workmen and others; to act as agents or brokers for others in buying and selling and dealing in all minerals, their by-products and merchandise, and generally to have and exercise all such powers and privileges as are incidental or relate to the object and purposes herein set forth or which may be necessary, useful or convenient for affecting any of said objects and purposes in the State of Arkansas and elsewhere in the United States and its possessions."
Paragraph six reads as follows: "Now therefore the trustees hereby declare that they will hold said property interest, and cash to be acquired by them, as well as other property or cash which they may acquire as trustees, together with all the proceeds thereof, in trust; to employ, manage and dispose of the same for the benefit of the holders from time to time of the certificates of shares issued."
Paragraph 16 reads as follows: "The trustees shall at all times hold the legal right and title to all property *Page 166 
at any time belonging to the trust, and, subject only to the specific limitations herein contained; they shall have absolute control, management and disposition and conduct of the business of the trust and enumerations of specific duties and powers herein shall not in any way act as a limitation upon the general powers intended to be conferred upon them."
"Paragraph 18 provided that the trustees should elect from their number a president, a vice-president, secretary, treasurer and general manager, and that such officers have authority as is usually incident to like officers in corporations, or other company, or such duties as may be granted or outlined by the trustees."
Appellant testified that J. T. Wilkins, O. Wilkins, E. E. Rudy, W. A. Bushmaier, Sr., and himself constituted the trustees who conducted the operations of the trust. The agreement was made on the 26th of November, 1924, and immediately thereafter they began to procure machinery, and after the first of January constructed buildings and began making brick on April 1, 1925. The plant was located on the ground leased from W. T. Jacobs, upon which the brick company had a lease, not owning any real estate. In June, 1925, O. Wilkins talked to him about it and said he believed they should buy the 10 acres from Jacobs, that it would be a good plan for them to own it, and he (Wofford) said he thought so too, and said he would be glad to put it up if he had it. About a week or 10 days thereafter, O. Wilkins told him he had bought the 10 acres from Jacobs for $800, and that, at any time the company wanted to take it over he would let them have it. Didn't say anything about whether the title was made to his wife or him, just spoke of having bought it. The checks given in payment for the land were introduced, one dated July 1, 1925, for $400, signed Oresta Wilkins, and the other dated July 3, 1925, for $400, signed O. Wilkins. The checks were dated at Danville, drawn on the Yell County Bank, and both appeared to have been paid by the bank on July 7, 1925. *Page 167 
Witness stated that Mr. Wilkins in the conversation with him told him that his wife had no separate means. The statements of O. Wilkins and J. T. Wilkins as to their financial condition were introduced in evidence, and some evidence tended to show they were accurate, while other evidence showed they were far from correct. There was a summary of Wilkins' financial statements showing of what it consisted, notwithstanding which it was shown that, when the appellee company failed to meet its obligations and the notes upon which they were joint sureties with appellant became due, they admitted they were unable to pay and their co-surety was compelled to pay same. Appellant paid the debts of the brick company, including sums advanced to it for services rendered in the sum of $27,373.04, and obtained judgment against O. Wilkins for his contributive share in the sum of $6,629.49, and against J. T. Wilkins for $4,694.44. Witness did not know the company was paying royalties to Mrs. Eula Wilkins during the course of the operations of the brick plant until about three years after the purchase of the property when he noticed an item due her for royalties at the January, 1929, meeting of the stockholders when he ascertained that the property was in her name. This was about three and one-half years after the purchase of the property by her. Witness had drawn the lease from Jacobs to the brick company for an acreage of considerably more than the 10 acres in controversy, which was included in the property. The deed of Jacobs to Mrs. O. (Eula) Wilkins recited a consideration of $800, and conveyed the 10 acres in controversy, was recorded on July 3, 1925, and is in the form of a regular warranty deed. Witness, being a trustee and present at the meeting and hearing the questions discussed, was aware that there was royalty being paid some one, but thought it belonged to O. Wilkins, and that they were paying him royalty or owed it to him. Witness detailed all information about the financial status of O. Wilkins and J. T. Wilkins, also of the company and the necessity for stopping *Page 168 
expenses, and finally the shutting down of operation, and the continuance of operation of the plant by O. Wilkins as a brokerage business.
J. T. Wilkins introduced an affidavit of the cashier of the Yell County Bank showing deposited therein to Eula Wilkins' credit certain sums in June, August, October, November and December, 1924, among which was a check of J. T. Wilkins amounting to $7,339.28, which he testified was his individual funds that he had given to her.
O. Wilkins testified that he had purchased the 10 acres of land, upon which the appellee company had a lease and upon which its plant was located, and took the title in the name of his wife. He testified that his father had given his wife the $7,000, which she transferred to him by check and had it put into his account when they came to Fort Smith, making his account total about $15,000. He testified about the closing down of the plant and the operation of the brokerage business by him in Fort Smith.
Appellant, Wofford, recovered judgment against the trust for $27,373.04, and their contributive share against the others, as already said.
(after stating the facts). Appellant insists that Wilkins, a trustee of the common-law trust, could not purchase for himself or his wife the property which was acquired for development and operation of the business of the trust, and that such purchase must necessarily operate for the benefit of the trust, and the land be held by him for it, as he agreed would be the case in the purchase thereof. Wilkins did not deny that he had agreed that it would be for the best interest of the trust to purchase the 10 acres of land from the lessor, nor that he later notified the appellant that he had purchased it, paying $800 therefor, and the trust could have *Page 169 
it when they wanted it upon payment of the purchase price.
Within the doctrine and principles announced in Haskell v. Patterson, 165 Ark. 65, 262 S.W. 1002, and Oil Fields Corporation v. Dashko, 173 Ark. 533,294 S.W. 25, a trustee under a common-law trust agreement is impliedly prohibited from purchasing on his individual account the property necessary for the use of the trust in the operation of its business for the purposes for which it was organized. The testimony herein shows that Wilkins acquired the title to the property in controversy under such circumstances as constituted a constructive trust, and that it would be a fraud upon the members of the trust to allow him to hold it in his individual right or to have the title conveyed to another to be so held against the interest of the trust, and he could not purchase said property for himself or another under such circumstances; hence it must be considered held for the benefit of the trust upon payment of the purchase price by it, as he gave assurance would be done upon making the purchase. In other words, the trust would be required to pay the amount of the purchase price of the land with interest to the purchaser, and this must be held to have been done in the payment to said purchaser of more than this amount in royalties for shales used off the tract of land in accordance with the terms of the lease under which it was first held. The court erred in decreeing otherwise, and, since the undisputed testimony shows that the holder of the title to the 10 acres of land so purchased has more than been paid, the entire amount of the purchase money with interest, it must be held to be the property of the trust and subject to the payment of its debts and liabilities. The chancellor's finding otherwise is not supported by the preponderance of the testimony, and is contrary thereto.
The decree is accordingly reversed, and the cause remanded with directions to enter a decree in accordance with this opinion. *Page 170