PAGE *v.* HARR.

5-595                                            278 S. W. 2d 121

Opinion delivered April 11, 1955.

[Rehearing denied May 16, 1955.]

*Rex W. Perkins, Lee Williams* and *E. J. Ball,* for appellant.

*Price Dickson* and *W. B. Putman,* for appellee.

GRIFFIN SMITH, Chief Justice. Fairview Memorial Park Association was created in 1922 by eight individuals and a business firm—Cravens & Co. The organizers subscribed to a declaration of trust containing a pledge that 28½ acres, with all other property or funds thereafter acquired, should be "held, used, and managed upon the trust herein declared."

By *ex parte* proceedings of February 16, 1953, Kenneth D. Harr and his wife, Lela Mae, who were joined by Hettie B. Moore and Chi Omega National Fraternity, procured from the Washington Chancery Court an order authorizing a sale to Fairview Cemetery, Inc. Shortly thereafter H. E. Page and twenty-five others who owned cemetery lots, acting for themselves and all others similarly situated, brought an action in the nature of an intervention. They sought an accounting of expenditures from the inception of trust activities, for the appointment of a board, and for an order requiring compliance with essential trust purposes. In particular it was urged that the decree authorizing a sale of the property be set aside. From a denial of most of the matters prayed for the interveners have appealed.

Of the original twenty-four shares held in 1922 by the nine organizers, nineteen came to Kenneth and Lela Mae Harr when Kenneth's father died in 1942, or were acquired thereafter. Hattie B. Moore owned three shares

and Chi Omega two. The declaration of trust created a five-man board with staggering terms, the last terminating November 1, 1927. These trustees, however, were to serve until their successors should be chosen.

Shares owned by the organizers—the number not having been specified—are referred to as beneficial interests evidenced by certificates. The directors were given uncontrolled discretion in respect of conversion and distribution, except that this should occur not more than twenty years after the death of the last survivor of the nine organizers. These interests, however, were burdened with an obligation to set aside in a special fund twenty percent of money realized from the sale of lots. This one-fifth interest was dedicated as a Perpetual Care Fund.

The directors were also permitted to withdraw from the proceeds realized when lots were sold enough money to guarantee an annual budget of $360 when added to interest derived from the Perpetual Care Fund and moneys realized from digging graves. Section III of the Articles of Trust is copied in the margin.[1] Trustees were permitted to purchase securities with these special funds. They were also allowed to change the form of the security from time to time, "to improve or increase [it], *always preserving the capital sum, and expending only the interest or the proceeds therefrom.*"

The decree referred to by appellants as having resulted from an *ex parte* hearing February 16th, 1953, contains a finding that the trust articles were duly recorded; that no dividends had been paid to any of the beneficial shareholders; that the declaration, though well-intentioned, ". . . has proven to be unrealistic over the years insofar as it applies to the creation of a Perpetual Care Fund; that accumulations to said fund have been

---

[1] That the aforesaid sum of 20% of all the proceeds of the sale of said lots shall be kept preserved as a fund for the preservation, maintenance, and ornamenting the grounds, lots, walks, shrubbery, memorials, boundaries, structures, and all other things in and about said cemetery and belonging to said trust, so that the purpose and intention thereof shall be carried out, and so that said grounds shall be and continue as cemetery grounds indefinitely.

inadequate to provide income with which to maintain said cemetery, with the result that not only have the funds paid into said [account] been used for maintenance, but also the entire proceeds of the sale of lots and the charges for opening graves [have been so used]."

Other directions in this order as modified are to be found in the decree resulting in this appeal and will be discussed in sequence.

In their answer to the lot owners' intervention Kenneth and Lela Mae Harr admitted that they had been in control of the cemetery since January 1, 1942. Receipts from the sale of lots, they said, had amounted to $29,591.13, and $29,857.88 had been spent in maintaining the properties. Some additional sums had been received, but the amount was not estimated.

Touching the Perpetual Care Fund their plea was that necessity had required its expenditure, and the defendants, "as they had a right to do," finally disposed of the property by selling it to Fairview Cemetery, Inc. It was further contended that the original trust was not put into effect. The trustees or board of directors did not qualify and they failed to make bond as required by their agreement. Because all of the individuals to the original transaction had been dead for more than seven years, limitation and laches were pleaded. The new purchaser had agreed to maintain and improve the cemetery.

By way of amendment the plaintiffs alleged that the Harrs had sold many lots and had failed to account for the proceeds. The prayer was that a lien be declared on approximately eighteen acres not in use after the amount due had been determined.

In February, 1954—a year after the first decree was rendered—the Chancellor found that Fairview Cemetery, Inc., was the owner of all beneficial interests. Holders of the certificates for twenty-four shares, said the court, were members of a business association commonly re-

ferred to as a Massachusetts Trust.[2] It was the Court's conclusion that these owners had the inherent power to make the sale. Terms of the 1922 trust were unworkable and did not carry forward the intentions of beneficial certificate-holders, the trustees, or the lot-holders.

By the Court's order of February 16, 1953 (the *ex parte* proceeding resulting in sale) a new method of perpetual maintenance was established, ". . . placing the burden [of upkeep] . . . on the beneficial interests, with the further provision that the amount of contribution to the trust fund be reduced from 20% to 15% until [it] reaches $30,000," then reduced to 10%.

It was the Court's view that the method adopted placed a greater burden on the holders of beneficial interests than the obligations assessed under the original agreement, ". . . and that plaintiffs and other lot-holders are in better position insofar as maintenance of the cemetery property is concerned than they were under the terms of the original trust." Extent of the obligations flowing from holders of beneficial shares "in said corporation" was $360 per year, while legitimate operating expenses incurred by the Harrs subsequent to the death of Kenneth's father consumed all receipts from the sale of lots and other activities, hence the plaintiffs and other owners of lots benefited to the extent of $3,960. This figure was arrived at through a finding that if terms of the trust had been complied with 20% of lot sales would have amounted to $5,918.23. The difference between these two items—$1,958.23—was ordered placed in an irrevocable trust fund of the Fairview Cemetery, Inc., to be charged against certain unpaid amounts due by the corporation as part of the purchase price.

---

[2] Massachusetts Trusts are discussed in *Greene County* v. *Smith*, 148 Ark. 33, 228 S. W. 738; *Betts* v. *Hackathorn*, 159 Ark. 621, 252 S. W. 602; *Coleman* v. *McKee*, 162 Ark. 90, 257 S. W. 733; *Palmer* v. *Taylor*, 168 Ark. 127, 269 S. W. 996; *Oil Fields Corporation* v. *Dashko*, 173 Ark. 533, 294 S. W. 25 (Cert. denied 275 U. S. 548, 72 L. Ed. 419, 48 S. Ct. 85); *Wofford* v. *Twin City Brick Co.*, 184 Ark. 162, 41 S. W. 2d 1079; *Haskell* v. *Patterson*, 165 Ark. 65, 262 S. W. 1002; *Missouri Pacific Railroad Co.* v. *Strohacker*, 202 Ark. 645, 152 S. W. 557. Also see 156 ALR 22 *et seq.*

There was reference to the decree of February 16, 1953, which permitted a reduction of the trust obligation in favor of the Perpetual Care Fund. Under the revised arrangement this apportionment (formerly mentioned) was reduced from 20% to 15% until the fund reached $30,000 and thereafter 10%.

It is conceded that U. S. bonds having a face value of $800 were found among trust records following death of the elder Harr, and that these were delivered to appropriate authorities for safekeeping.

A new trust agreement dated April 10, 1953, subscribed to by Fairview Cemetery, Inc., and McIlroy Bank, trustee, was filed February 26, 1954. It indicates what the testimony seems to disclose—that after the proceedings in February, 1953, the corporation took charge of cemetery property and operations. Its proprietary status has not been disturbed by the decree of 1954,—more than a year after the first order.

Sale of the trust properties was made for a net consideration of $15,000, $5,000 of which was paid. Two of the Fairview incorporators are residents of Kansas City, Kansas, while the third gave his address as Prairie Valley, Kansas. Admittedly the promoters are interested in other cemeteries.

James Knowles, manager for Fairview, whose home is in Fayetteville, testified that notwithstanding the new corporation's trust agreement with the McIlroy Bank, 20% realized from the sale of lots had been set aside for maintenance if the sale were for cash. The intention was to continue this practice "in the older section"—that is, in the area referred to as the tombstone section. Since February, 1953, $183 or $187 had been realized for this purpose. A different portion of the cemetery was spoken of as the monument section. This comprises fifteen or eighteen acres and is to be developed according to "religious garden ideas." There will be a central figure depicting some phase in the life of Christ, "or something taken from the Bible." In the undeveloped 15 or 18 acres four or five such gardens will probably be laid out. If

but 15 acres should be developed and five gardens completed, each would occupy three acres with 600 burial spaces to the acre. A lawn-like picture in colors was introduced by the witness for purposes of illustration. It was taken at Des Moines, Iowa.

William B. Roberts, one of the incorporators who owns 500 of the authorized issue of 1,000 shares ($10,-000) testified that the intent was to sell lots to people who at the time did not need them, but whose necessities would later mature. In this way a substantial trust fund could be built up. The witness submitted a printed form containing the agreement lot purchasers are required to subscribe to. It constitutes a contract between Fairview Cemetery and the purchaser. The latter acquires the exclusive right of interment in a plot to be selected within two years. A further covenant by the seller is to expend for general improvements and developments, including the building of gardens, a sum equal to not less than 15% of the purchase price, "provided such sum together with a like amount of all previous plot sales made by the company shall not already have been expended for such purposes subsequent to March 1st, 1953." The construction placed on this contract by Roberts was: "We guarantee that we will spend 15% in the cemetery to develop it, along with the 15% that we agree to put in the trust fund." Roberts also testified that an average charge of $69 for each burial lot would yield about three quarters of a million dollars.

There was introduced in evidence a deed executed to a lot purchaser in August, 1951, by Fairview Memorial Park Association. Kenneth Harr signed as president and Lela Mae Harr as secretary. It was conceded that this was in all essential respects similar to deeds issued since 1922. There is this provision:

"The said Fairview Memorial Park Association hereby further covenants and agrees with the said grantee to set aside twenty percent of the consideration of this deed forever, in trust, and said Association shall forever hereafter, from the income of said sums, and from

the income from other funds created from a definite part of the proceeds of lot sales, from time to time, apply the income from said amounts for the perpetual care and maintenance of said Fairview Memorial Park Cemetery." Details of upkeep were then set out, as shown in the margin.[3]

We think the court erred in altering obligations imposed by the articles of trust. The pleas of limitations and laches were correctly sustained as to the trustees, but the acreage stands charged with a sum equal to twenty percent of lot sales. Unless the parties to this litigation can agree upon the gross amount received from lot sales from 1922 until February 16, 1953, and stipulate what 20% of this sum would be (less actual expenditures from increment of the 20%, [the 20% being a permanent fund] and less the bond credit of $800) a master should be appointed to state the account. This resulting balance should be set apart as a Permanent Care Fund, to which must be added 20% of the price for which lots were sold after February 16th, and for which they will be sold until the entire acreage has been disposed of in accordance with the original trust indenture.

The amount found by the master to be due (in the event an accord cannot be reached, and should the Chancellor not wish to undertake the accounting task as a judicial transaction) must be declared a lien on the acreage appellee has purchased. If the corporation elects, because of this reversal, to rescind its contract, it may do so in circumstances showing that all transactions have been accounted for since activities began, settlement to be on a basis in harmony with the spirit of this opinion.

---

[3] "To keep the sod in order and repair, and all places where interments have been made in proper order, to care for trees and shrubs, and keep all monumental work in a vertical position as long as the same may last, and in the perpetual care of avenues, fences, buildings and grounds in general. It being understood and declared that the directors of the said Association shall not be bound to make any separate investment of the sum of money hereby given, but may add the same to that created from a definite part of the yearly proceeds of lot sales, and the board of directors may, by special vote, use any portion of the income accruing therefrom which may remain after the fulfillment of the obligation hereby assumed, for ornamenting and improving the grounds of the said Cemetery, AND FOR NO OTHER PURPOSE." (The capitalized words appear as such in the deed.)

In the event appellee elects to affirm its contract the Chancellor should, by appropriate order, safeguard the Permanent Care Fund in such a way that graves in the old cemetery area will not be discriminated against in the matter of upkeep.

The record shows that in examining witnesses reference was made to "the Act of 1953." Ark. Stat's, § 82-401 *et seq.* are in the main taken from Act 204 of 1929. Supplemental provisions are contained in Act 283 of 1949, Ark. Stat's (supplement) § 82-401, *et seq.* Act 250 of 1953 is legislatively designated as the Cemetery Act. Ark. Stat's, §§ 82-411 to 82-426, inclusive. (See § 18 of the 1953 enactment for language of the repealing clause.)

These statutory provisions do not affect the obligation of contract incurred under the trust commitments of 1922.

Reversed, with directions to proceed in a manner not inconsistent with this opinion.